EXHIBIT 1

# LIBERTY & FREEDOM
## LEGAL GROUP
**Empowering YOUR Voice through Civil Rights Advocacy**

July 2, 2024

**Sent Via E-Mail: (IHOQUEST@SCHOOLS.NYC.GOV)**

Impartial Hearing Office
New York City Department of Education
131 Livingston Street, Room 201
Brooklyn, NY 11201

### DUE PROCESS COMPLAINT - SCHOOL YEAR 2024-2025

Student:
NYC ID#:
DOB:
Parent(s)/Guardian(s):        Maylene Otero
Home Address:
School:                       International Academy for the Brain ("iBRAIN")

To Whom It May Concern:

     The Liberty and Freedom Legal Group, Ltd. ("Counsel"), represents the above-named student ("Student" or "          " and her Parent/Legal Guardian, Maylene Otero (hereinafter referred to as "Parent")(collectively "Clients"), in matters pertaining to the classification, program, placement, and implementation of special education and related services for the Student for the 2024-2025 extended school year ("24/25 ESY").

     The New York City Department of Education ("DOE") has procedurally and substantively denied the Student a Free Appropriate Public Education ("FAPE") as mandated by federal and state law, for the 24/25 ESY. Accordingly, we write to request an impartial hearing pursuant to Section 1415 of the Individuals with Disabilities Education Act, 20 U.S.C. §1400, et seq. ("IDEA"), Article 89 of the New York State Education Law, and Part 200.5 of the Regulations of the New York State Commissioner of Education.

     Please note, as per 34 C.F.R. §300.510(a)(1), and consistent with 20 U.S.C. §1415(f)(1)(B)(i), within fifteen (15) days of receiving notice of the Parent's Due Process Complaint ("DPC") and prior to the initiation of an impartial due process hearing under 34 C.F.R. §300.511, the DOE must convene a meeting with the Parent and the relevant members of the IEP Team who have specific knowledge of the facts identified herein. The Parent requests an immediate Resolution Meeting. In the event DOE fails to hold the Resolution Meeting within fifteen (15) days of receipt of the Parent's DPC or fails to participate in the Resolution Meeting, then Parent is requesting the Impartial Hearing Officer ("IHO") start the impartial hearing timeline immediately as per 34 C.F.R. §300.510(b)(5) and 8 N.Y.C.R.R. §200.5(j)(2)(vi)(b). The Parent also requests that the Impartial Hearing Office expedite this DPC by scheduling a pre-hearing conference immediately to address the ongoing violations of state and federal law as outlined below. Our Clients request that any Impartial Hearing be open to the public as per 34 C.F.R. §300.512(c).

**Address:**
300 East 95th Street
Suite 130
New York, NY 10128

**Phone:**
646-850-5035

## PENDENCY

Our Clients request an interim order of pendency pursuant to federal and state special education law. Specifically, the federal IDEA and New York Education Law both contain "stay-put" provisions which give the child the right to remain in his or her current educational placement at public expense during the pendency of any administrative or judicial proceedings. 20 U.S.C. §1415(j); N.Y. Educ. Law 4404(4). Thus, the law allows the Student to remain in her "last-agreed-upon placement" until the impartial hearing process (including all appeals) is complete, unless the Parent and the DOE otherwise agree in writing.

As per 20 U.S.C. §1415(j), the Student's pendency entitlements are automatic and are required to be implemented by the DOE as a matter of law without the necessity of any application, motion, or other showing by Student's counsel, until there is a final order.

The DOE was put on notice through the Ten-Day Notice filed by the Parent (see Exhibit A) that the Parent is seeking to assert their "stay-put" rights.  While not required, attached is a Pendency Form based on the DOE's previous forms outlining the basis for pendency and the pendency program (see Exhibit B).  The legal basis for pendency for this Student is attached as Exhibit C.  The DOE has not responded to the Parent's Ten-Day Notice regarding Pendency, nor have they made any indication they will begin implementing the Student's Pendency Placement.

Due to the DOE's history of failing to automatically implement the Student's pendency in previous school years, we respectfully request an immediate pendency hearing so an Interim Order on Pendency can be issued by the Impartial Hearing Officer ("IHO").  Without the implementation and honoring of the statutory entitlement of pendency, the Student will suffer from the lack of funding for the services and program at iBRAIN.  We are providing a Draft Interim Order on Pendency (See Exhibit D), which includes:

- Funding for the cost of tuition, and supplemental services, where applicable, to be paid directly to the International Academy for the Brain ("iBRAIN") pursuant to the enrollment agreement between the Parent-Petitioner and iBRAIN (see Exhibit E) as outlined in Petitioner's Due Process Complaint;
- Funding for transportation services, as well as all services necessary to said transportation, to be paid directly to the transportation provider, pursuant to the transportation contract between the Parent-Petitioner and the transportation company (see Exhibit F) as outlined in Petitioner's Due Process Complaint; and,
- Funding for nursing services, as a necessary related service, to paid directly to the nursing service provider, pursuant to the nursing contract between the Parent-Petitioner and nursing service provider as outlined in Petitioner's Due Process Complaint.

## DISPUTED ISSUES

This DPC includes three sections: (I) a description of ███████ educational needs and abilities; (II) an enumeration of the ways by which DOE failed to meet its obligation to provide ███████ with a FAPE; and, (III) a proposal for how this failure may be remedied.

# I.     STUDENT'S EDUCATIONAL NEEDS AND ABILITIES

██████ suffers from a brain injury resulting in severe impairments in the following areas: cognition, language, memory, attention, reasoning, abstract thinking, judgment, problem solving, sensory, perceptual and motor abilities, psychosocial behavior, physical functions, information processing and speech. ██████ is diagnosed with hydrocephalus, developmental delay, cerebral palsy, low sugar episodes, low tone, and has a G/J-tube. She also demonstrates visual functioning abilities consistent with Cortical Visual Impairment ("CVI"). These impairments have adversely affected ██████ educational skills and performance.

Due to the severe nature of her brain injury, ██████ is non-verbal and non-ambulatory, and has highly intensive management needs, requiring a high degree of individualized attention throughout the school day. She requires a modified environment to minimize extraneous auditory and visual stimulation, as well as the use of assistive technology. She has difficulties with self-care tasks, grasping and manipulating objects, coordination and movement, and has decreased safety awareness and attention span. ██████ requires assistance in all activities of daily living. Furthermore, ██████ needs close monitoring and constant care of her G/J tube, and she also requires a medical professional to feed her through her G/J tube. During these times, ██████ requires additional support and intervention from her 1:1 nurse to maintain her active participation in her classroom or related service sessions.

Accordingly, ██████ requires a small, 6:1:1 class size, structured classroom offering an educational program delivered via a 1:1 direct instruction model, with a full-time 1:1 paraprofessional during the school day and while in transit to and from school to assist with all classroom activities, related services, and activities of daily living. The Student also needs a 1:1 nurse that assists her with her medical/health needs. ██████ requires a modified environment which reduces visual and sound distractions. She also requires a two-person transfer to and from her wheelchair or other repositioning. In addition, periodic breaks, additional processing time for tasks, and purposeful repetition of tasks during therapy sessions and educational instruction are required to accommodate ██████ highly intensive needs for her to receive educational benefits and to make progress.

██████ requires an extensive regimen of related services, delivered in 60-minute sessions, including occupational therapy (OT), physical therapy (PT), speech and language therapy (SL), assistive technology (AT), vision education services (VES), and music therapy (MT) in order to benefit from special education instruction. Because of the intensive level of services that ██████ requires, it is necessary for her to attend a program which operates on an extended school day, as part of an extended school year program. ██████ also requires an extended school day in order to accommodate the intensive level of care required to prepare her for the school day upon arrival, and to prepare her for dismissal at the end of the day.

**EDUCATIONAL PROGRAM HISTORY**

▮▮▮▮ began attending iBRAIN in October 2020. At iBRAIN, ▮▮▮▮ continues to receive an appropriate educational program that addresses all of her health and educational needs. Since ▮▮▮▮ enrollment at iBRAIN, she has received all of her related services and academic instruction, as well as additional support, 1:1 nursing, and special transportation, at iBRAIN.

As stated herein, DOE has denied the Student a FAPE by failing to offer or provide an Individualized Education Program ("IEP") and placement reasonably calculated to provide ▮▮▮▮ with educational benefits and to make progress. First, there were significant Procedural Violations of the IDEA for all of the IEPs DOE created for this Student which (a) impeded the Student's right to a FAPE; (b) significantly impeded the Parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the Student; and (c) caused a deprivation of educational benefits.

These Procedural Violations include, but are not not limited to, a failure to: (1) Provide Procedural Safeguards Notice; (2) Conduct an evaluation or reevaluation (at least every 3 years); (3) Provide Parent with mandated notices, such as, Meeting Notices, PWNs, IEPs, and Evaluations; (4) Provide Parent with information on how to request an IEE at public expense; (5) Acknowledge/listen to/accommodate Parent's concerns at the IEP meeting; (6) Provide appropriate PWN for each change or refusal to change proposed program; (7) Place Student in the least restrictive environment (LRE); (8) Develop an IEP for each school year at issue; (9) Include appropriate present levels of performance in the IEP; (10) Identifying Student's needs; (11) Include goals to match each of the Student's needs that are objectively written with a baseline of performance (Objective means of measuring progress on a regular basis); (12) Include a section in the IEP regarding the Parent's concerns, or failure to include Parent's concerns and failure to inform Parent about this option; (13) Include or address assistive technology (AT) needs; (14) Include or identify all Student's management needs; (15) Clearly identify all services provided including Location, Frequency, and Duration; (16) Explain whether Student is to be educated with non-disabled peers, and when; (17) IEP meeting notice and meeting failed to include mandated members of the CSE team and therefore failure to convene a properly composed CSE team without the Student's Special Education Teacher, Related Service Providers, Parent Member, among others; (18) Failure to follow proper procedures in developing an IEP; (19) Critical decisions made outside of IEP team and CSE meeting; (20) Critical decisions pre-determined; (21) Timely and/or actually conduct an annual CSE review and develop an IEP; and, (22) Timely or actually provide an appropriate school location notice.

In addition, there are many Substantive Violations of the IDEA which the DOE committed in the development of the IEP for ▮▮▮▮ including, but not limited to: (1) the Student's disability and unique needs from that disability are not identified in the IEP; (2) there were no current or appropriate evaluations done prior to the development of the IEP; (3) an IEE should have been conducted; (4) the IEP does not fully explain the academic instruction or each related service the Student will receive and whether the teachers and providers are properly trained; (5) the IEP does not provide training for (a) assistive technology, (b) two-person transfers, (c) seizures and other

4

health and medical needs of the Student; (6) many of the goals are not measurable or appropriate, or repeat year after year; (7) the IEP does not reflect meaningful progress nor does the level of progress correctly reflect the Student's potential; (8) there are no appropriate accommodations on the IEP; (9) it is not clear how classwork, testing, and curriculum are modified for this Student; (10) the Student is not educated alongside non-disabled peers; (11) the Student will not attend an appropriate class size or be educated with peers who have similar management, behavioral, physical, social/emotional, or academic needs; and (12) the Parent's concerns are not included nor addressed.

## 2024-2025 School Year

DOE convened a Committee on Special Education ("CSE") meeting for ▮▮▮▮ on February 28, 2024 to develop an IEP for ▮▮▮▮ for the 2024-2025 extended school year ("February 2024 IEP"). At that February 2024 IEP meeting, the CSE recommended a 12:1:4 class in a District 75 public school. The CSE also recommended the following related services:

> OT: 5 times per week, individually, for 60 minutes per session;
> PT: 5 times per week, individually, for 60 minutes per session;
> SL: 5 times per week, individually, for 60 minutes per session; and
> AT: 1 time per week, individually, for 60 minutes per session.

The CSE also recommended that ▮▮▮▮ receive an AT device, and a full time 1:1 nurse and a full time 1:1 paraprofessional. However, the CSE failed to recommend MT or VES. For special transportation accommodations, the CSE recommended a 1:1 travel paraprofessional, and a lift bus. However, the CSE failed to recommend air conditioning, a limited travel time, or a 1:1 travel nurse.

Parent expressed, and ▮▮▮▮ teachers and service providers agreed, that a 12:1:4 class in a District 75 public school program would be too large and would fail to address her highly intensive management needs. There is no evidence that ▮▮▮▮ will succeed in a class larger than a 6:1:1 setting, because a larger class would not allow her to attend and learn effectively or receive educational benefits. Moreover, ▮▮▮▮ school staff also noted that she requires a very specialized environment for safety reasons, as her medical needs warrant a placement with peers and staff appropriately trained for her unique needs, including her respiratory issues. Also, the lack of provision of music therapy by a board-certified music therapist would only serve a recreational and not a therapeutic purpose. Likewise, the Parent and school expressed their disagreement with the CSE's decision not to recommend vision education services. The Parent also expressed her disagreement with the CSE's failure to recommend a 1:1 travel nurse for ▮▮▮▮ in addition to limited travel time and air-conditioning which she needs to safely attend school. This is especially concerning to the Parent because the CSE clearly recognized ▮▮▮▮ need for a 1:1 nurse in school, but failed to recommend one to accompany her on the bus.

Despite her concerns, Parent remained willing to investigate any appropriate DOE-recommended placement for ▮▮▮▮ However, to date, DOE has not sent a PWN or SLL for ▮▮▮▮ for the 24/25 ESY. Given the circumstances and ▮▮▮▮ conditions, Parent had no choice but to evaluate alternative options.

As a result of the issues noted above, the Parent decided to re-enroll ████ at iBRAIN and informed DOE of this decision via a Ten-Day Notice ("TDN") on June 14, 2024, seeking public funding for ████ program at iBRAIN.

At iBRAIN, ████ attends a 6:1:1 class with direct instruction. She also receives the following related services:

> OT: 5 times per week, individually, for 60 minutes per session;
> PT: 5 times per week, individually, for 60 minutes per session;
> SL: 5 times per week, individually, for 60 minutes per session;
> MT: 2 times per week, individually, for 60 minutes per session, and 1 time per week, in a small group, for 60 minutes per session;
> VES: 3 times per week, individually, for 60 minutes per session; and
> AT: 1 time per week, individually, for 60 minutes per session.

Her related services are provided on a push-in/pull-out basis to enable ████ to generalize skills in multiple environments.

Also at iBRAIN, ████ uses an AT device, receives the services of a 1:1 paraprofessional to ensure her participation in and ability to benefit from her academic and related services. She also receives the services of a 1:1 nurse to monitor her ostomy sites, perform venting when ████ presents with bloating, feeding ████ through her G-J tube, and attend to all her medical safety needs. Furthermore, she receives transportation services, which include: a 1:1 travel nurse, a lift bus/wheelchair ramp, air conditioning, and limited travel time.

## II.     DOE FAILED TO PROVIDE A FAPE TO STUDENT

The Parent contends that DOE failed to offer or provide ████ with a FAPE because DOE failed to recommend a program and placement uniquely tailored to meet ████ needs for the 24/25 ESY.

In addition to a substantively defective and inappropriate IEP, DOE, to date, has failed to provide the Parent with a Prior Written Notice ("PWN") or a School Location Letter ("SLL"). These failures constitute a denial of a FAPE for the 24/25 ESY. Thus, the Parent has been unable to review a recommended school placement being there have been none recommended or otherwise provided.

The Parent additionally challenges any and all IEPs offered to ████ for the 24/25 ESY. This request is based on the following factors which have procedurally and substantively denied ████ a FAPE, including but not limited to:

### A.     DOE FAILED TO RECOMMEND AN APPROPRIATE SCHOOL LOCATION

    a. DOE failed to recommend an appropriate school location for ████ for the 24/25 ESY, thereby denying ████ a FAPE.

    b. To date, the DOE has failed to provide the Parent with a SLL, leaving ████ with

no identified school to attend.

    c. The recommended 12:1+(3:1) class in a District 75 public school does not provide ███████ with the quiet, distraction-free environment she needs to receive educational benefits and make progress.

    d. The proposed 12:1+(3:1) class in a District 75 public school is not appropriate.

       i. Pursuant to the Commissioner's Regulation §200.6, the size and composition of proposed classes shall be based on the "similarity of the individual needs of the students according to: (i) levels of academic or educational achievement and learning characteristics; (ii) levels of social development; (iii) levels of physical development; and (iv) the management needs of the students in the classroom."

       ii. The majority of the students in District 75 12:1+(3:1) classes are ambulatory, which indicates that ███████ will <u>not</u> be placed with students who have similar needs and abilities, which is her entitlement under 8 N.Y.C.R.R. § 200.6(h)(3).

       iii. There is a wide range of academic, social, emotional, behavioral, physical, and developmental needs in the proposed District 75 12:1+(3:1) class.

       iv. The recommended classroom presents safety risks to ███████ because a majority of the students in 12:1+(3:1) classes are ambulatory.

    e. DOE failed to recommend a school location where the February 2024 IEP could be implemented by its failure to recommend an extended school day. There are simply not enough hours in the regular school day to provide ███████ with the program recommended by the proposed February 2024 IEP. Thus, DOE's failure to recommend an extended school day constitutes a denial of FAPE.

## B.  <u>DOE FAILED TO EVALUATE ███████████ IN ALL AREAS OF HER SUSPECTED DISABILITY</u>

    a. DOE failed to conduct updated psychoeducational or neuropsychological testing prior to the 24/25 ESY.

    b. DOE failed to conduct updated evaluations in OT, PT, vision, and SL prior to the 24/25 ESY.

    c. DOE denied the Parent's request for music therapy without conducting its own evaluation.

    d. DOE failed to conduct any evaluations on ███████ in advance of the 24-25 ESY.

    e. DOE's evaluations failed to thoroughly assess ███████ in all areas of her suspected disability.

    f. DOE failed to adequately address the Parent's request to consider an NYSED-approved Non-Public School (NPS), by, inter alia, failing to conduct evaluations in connection with an NPS placement, which is violative of the DOE's Standard Operating Procedures Manual ("SOPM").

    g. DOE failed to conduct a psychological assessment completed within three years or, if the school psychologist determined that this was unnecessary, a written report by the psychologists indicating the reasons the assessment was not needed before the February 2024 IEP meeting.

    h. DOE failed to assess ███████ specific educational needs for the last six months.

    i. DOE failed to recommend an NPS program that would be appropriate for ███████

given that there was no appropriate DOE program.

j.  The Parent hereby disagrees with the DOE's evaluations, or lack thereof, and formally requests an order directing DOE to fund independent educational evaluation ("IEE") in the form of an independent neuropsychological evaluation to be conducted by a qualified provider of the Parent's choosing at a reasonable market rate.

## C.  DOE FAILED TO RECOMMEND APPROPRIATE RELATED SERVICES

a.  Due to her complex medical history and diagnoses, ████ requires a 1:1 nurse to address her health and medical needs which would increase her participation in classroom activities. ████ needs a trained medical professional to assist with feeding, breathing/suctioning, monitor for seizures and respond immediately, and to ensure that Keilany remains on schedule for all required medications.

b.  Without a skilled nurse, ████ will not be able to safely travel to school. The DOE's failure to address ████ need for 1:1 skilled nursing during transit is a denial of FAPE. The DOE's proposed IEP also acknowledges ████ health and medical conditions and her Parent's concerns expressed at the meeting regarding the CSE failing to recommend a 1:1 skilled nurse on the bus to address her acute needs. Yet, again, the DOE leaves out these essential and potentially life-sustaining services out of its recommendations with no meaningful justification.

c.  DOE failed to recommend MT, a related service provided by a licensed music therapist, that enables ████ to receive access to her special education instruction.

d.  DOE failed to recommend VES, which ████ needs to address her CVI.

e.  DOE failed to recommend appropriate transportation accommodations for ████ including but not limited to, a failure to recommend a 1:1 travel nurse, air conditioning, and limited travel time.

## D.  DOE DENIED PARENT MEANINGFUL PARTICIPATION IN THE IEP PROCESS

a.  By failing to timely notify the Parent of its final recommended placement for ████ for the 24/25 ESY through a PWN and/or a SLL, DOE has impeded the Parent's ability to investigate the proposed educational program and placement.

## E.  DOE PREDETERMINED THE OUTCOME OF THE STUDENT'S IEP

a.  Despite the clear, unequivocal recommendations of ████ teacher and service providers that she be placed in a small class so that he can benefit from instruction with minimal distraction, as well as the Parent's statements of concern that ████ would regress in a placement that included a larger sized classroom, DOE went ahead and recommended what they intended to do.

**iBRAIN IS APPROPRIATE FOR ███████ AND THE EQUITIES FAVOR THE PARENT'S CLAIMS**

The educational program ███████ currently receives at iBRAIN continues to be appropriate. ███████ attends a 6:1:1 special class with direct instruction, which minimizes distractions and enables ███████ to attend, receive educational benefits, and make progress. ███████ receives an intensive regimen of related services, including OT, PT, SL, AT, VES, and MT, all delivered in 60-minute sessions, on a push-in/pull-out basis to enable the Student to generalize skills in multiple environments. This past school year, ███████ made considerable progress in all domains at iBRAIN. It is incontrovertible that at iBRAIN, ███████ is receiving special education instruction, including related services, designed to meet her unique needs.

The Parent has always made ███████ available for evaluations, observations, and assessments by DOE. The Parent attended the February 2024 IEP meeting and actively participated in the meeting. The Parent disagreed with DOE's recommended IEP and placement recommendation at the meeting. And the Parent timely sent DOE a Ten-Day Notice. Accordingly, equitable considerations favor a full award of tuition and related services, including special transportation and nursing, for ███████ at iBRAIN.

**III.    PROPOSED RESOLUTION FOR DOE'S FAILURE TO PROVIDE A FAPE**

In light of the above, DOE has failed to offer ███████ a FAPE for the 24/25 ESY. Furthermore, ███████ placement at iBRAIN for the 24/25 ESY is appropriate to address ███████ academic, physical, and social/emotional needs, and is reasonably calculated to confer educational benefits upon ███████ Additionally, there are no equitable considerations which would bar direct/prospective payment for all costs associated with ███████ placement at iBRAIN, as, at all relevant times, our Clients have cooperated in the CSE/IEP review, development, and placement process.

Our Clients hereby reserve the right to raise any other procedural or substantive issues that may come to their attention during the pendency of the litigation of this matter, including, but not limited to: (1) challenging the qualifications of any of the DOE's proposed supervisors, teachers, paraprofessionals, and/or any other service provider who might have been assigned to work with ███████ (2) challenging the appropriateness of DOE's recommended placement by claiming that it cannot or will not maintain an appropriate student-to-staff ratio for the entirety of the school day and that the Student's IEP can be implemented as drafted without an extended school day; and, (3) challenging the appropriateness of DOE's recommended placement by claiming that it will not or cannot provide ███████ with all of the related services she needs to make meaningful progress.

In an effort to avoid prolonged litigation of this matter, Parent proposes the terms of settlement discussed below:

a.  An Interim Order of Pendency, as set forth herein, finding iBRAIN to be the Student';s

    pendency placement.

b.  Order declaring that DOE denied Student a FAPE during the 24/25 ESY;

9

c.  A determination that iBRAIN is an appropriate placement for Student;

d.  An Order declaring that equitable considerations favor full funding by the DOE for ███████ placement at iBRAIN for the 24/25 ESY;

e.  An Order directing payment by DOE directly to iBRAIN for the cost of Full Tuition, and for related services, for the 24/25 ESY, in accordance with the enrollment agreement between the Parent and iBRAIN;

f.  Direct payment/prospective funding for a 1:1 nurse for the Student in accordance with the terms of the nursing agreement between the Parent and the nursing agency for the 24/25 ESY;

g.  Direct payment/prospective funding of special transportation services in accordance with the terms of the transportation agreement between the Parent and the transportation company for the 24/25 ESY;

h.  Reconvene a new IEP meeting to address changes if necessary;

i.  An Order directing DOE to fund an independent neuropsychological evaluation.

Should this matter proceed to litigation and Parent is a prevailing party on any substantial issue, then we will additionally seek an award of attorneys' fees and the recovery of all related fees and disbursements as permitted by relevant statute.

Respectfully submitted,

/s:/ Peter G. Albert
Peter G. Albert, Esq.
*Attorneys for the Plaintiffs*
Liberty and Freedom Legal Group, Ltd.
300 E. 95th Street, #130
New York, New York 10128
Email: hearings@pabilaw.org

# LIBERTY & FREEDOM
# L E G A L   G R O U P
**Empowering YOUR Voice through Civil Rights Advocacy**

June 14, 2024

**Sent Via Electronic Mail: (10daynoticecse9@schools.nyc.gov)**
New York City Department of Education
Committee on Special Education 9
333 Seventh Avenue, 4th Floor
New York, New York 10001

## <u>TEN-DAY NOTICE</u>

Student Name:                  ████████████████
NYC OSIS ID Number:    ████████████
Date of birth:                    ██████████
Parent(s)/Guardian(s):      Maylene Otero
Home Address:                  ██████████████████████████

To Whom It May Concern:

The Liberty and Freedom Legal Group, Ltd. ("Counsel"), represents the above-named student ("Student" or "████████ and their parent(s)/guardian(s) ("Parent") (collectively "Clients"), in matters pertaining to the classification, program, placement, and implementation of special education and related services for the Student.

Pursuant to 20 U.S.C. §1412 (a)(10)(C)(iii) and 34 C.F.R. §300.148 (d)(1)), and on behalf of our Clients, we are providing the New York City Department of Education, the Student's local educational agency ("DOE"), ten (10) business days' notice of the Parent's rejection of the most recent proposed DOE Individualized Education Program ("IEP"), recommended program and school placement, for the 2024-2025 extended school year ("ESY") because of the DOE's failure to offer or provide the Student with a Free Appropriate Public Education ("FAPE") and maintain the Student at their last agreed upon educational placement, the International Academy for the Brain, d/b/a iBRAIN, Ltd. ("iBRAIN"), while seeking public funding for the Student's placement. iBRAIN is located at 403 East 91st Street, New York, NY 10128, and is a specialized educational program designed to educate students, like the Student, who suffer from a brain injury or brain-based disorder. Also, no school location letter for the 2024-2025 ESY has been issued. If DOE recommends the same District 75 public school as last year, please note the Parent has previously rejected that location because it was not appropriate for the Student.

The Parent is requesting the DOE to maintain this status quo during the pending impartial hearing process and any appeals, through the "stay-put" provision pursuant to 20 U.S.C. §1415 (j) and have included the DOE Pendency Form already pre-populated with this Ten-Day Notice, as Exhibit A. In order to maintain the Student in their pendency program, please be prepared to fully implement this pendency placement at the start of the extended school year.

This notice is sent in addition to the Parent having expressed their concerns, disagreements, and rejection of the Committee on Special Education's ("CSE") recommendations at the most recent

Address:

300 East 95th Street
Suite 130
New York, NY 10128

Phone:

646-850-5035

A - 1

Individualized Education Program ("IEP") meeting. The Parent continues to request Independent Education Evaluations (IEEs) of the Student; to be conducted at public expense, in order to appropriately assess the Student in all areas related to their suspected disabilities, including, but not limited to neuropsychological, physical therapy, occupational therapy, speech-language therapy, special education and assistive technology assessments due to the lack of proper assessments conducted by the DOE prior to the development of the most recent IEP meeting.

The Student is a child who suffers from a brain-based injury and the Student's educational needs are multifaceted and complex, and the DOE's recommended program and placement will not appropriately address their educational needs for the 2024-2025 extended school year.

Based on the Parent's review of the proposed recommended program and placement for the Student, the proposed IEP to be implemented during the 2024-2025 extended school year is not designed to enable the Student to receive appropriate educational benefits or receive appropriate related services. The proposed District 75 public school placement recommendations cannot be implemented, as proposed in the IEP, during the regular school day. The Parent is also concerned about the appropriateness of the recommended placement for reasons including, but not limited to, class size ratio, class functional and academic grouping, staffing, accessibility, availability of adequate resources, and the lack of individualized attention and support. Further, the Parent is concerned the physical structure and facility of the proposed school location is not appropriate to address the Student's individual needs.

Our Clients remain willing and ready to entertain an appropriate public or approved non-public school placement that can provide the required intensive academic and related services program the Student requires. Accordingly, the Parent requests the CSE reconvene for this purpose once the IEEs have been completed in order to develop an appropriate IEP. At this time, however, the Parent has no choice other than to re-enroll the Student in iBRAIN, which is an appropriate placement for the Student and is the last agreed-upon placement between the Parent and the DOE.

Very truly yours,

/s/:Peter Albert
Peter Albert, Esq.
Liberty and Freedom Legal Group, Ltd.
Attorneys for Parents


cc:    Maylene Otero
omaylene@gmail.com

## **Pendency Implementation Form**

*Please complete the form above the bold line. The DOE will review all submissions prior to implementation.*

| Student Name | OSIS Number | DPC Number |
|---|---|---|
| ███████ | ███████ | |

1. The basis for pendency is:    Unappealed FOFD IHO Case No. 205442, 11/20/2021

2. The pendency program consists of the following:

| Tuition | | |
|---|---|---|
| **School Name** | **10- or 12-Month Program** | **Other Notes** |
| International Academy for the Brain (iBRAIN) | 12-month program | Direct payment of Full Tuition to iBRAIN as per the terms of the enrollment contract between iBRAIN and parent |

| Services | | | | |
|---|---|---|---|---|
| **Service or Item** | **Ratio and Frequency** | **10- or 12-Month Program** | **DOE or Private Provider** | **Private Provider Name and Rate** |
| Special Transportation services | Daily; Round-trip for all school days | 12-month | Private | Direct payment to Sisters Travel and Transportation Services, LLC as per the terms of the transportation agreement with the parent |
| | | | | |

Form submitted by: Peter Albert, July 2, 2024, Parents' Counsel

---

For DOE use only:

The above program should be implemented as pendency

Pendency starts on: July 2, 2024
The date the DPC was filed: July 2, 2024

_____    _____
DOE Reviewer            Date

**B - 1**

# FINDINGS OF FACT AND DECISION

Case Number: 205442

Student's Name: ████████████, ████████

Date of Birth: ████████

District: 75

Hearing Requested By: Parent

Dates of Hearing: 7/29/21,8/30/21,9/23/21,10/6/21,10/7/21

Record Close Date:  11/19/2021

Hearing Officer:  Helene Peyser, Esq.

**NAMES AND TITLES OF PERSONS WHO APPEARED VIA TELEPHONE ON 07/29/2021**:

For the Student:

REDACTED, Attorney

For the Department of Education:

REDACTED, Attorney

**NAMES AND TITLES OF PERSONS WHO APPEARED VIA TELEPHONE ON 08/30/2021**:

For the Student:

REDACTED, Attorney

REDACTED, Parent

For the Department of Education:

REDACTED, Attorney

REDACTED, Attorney

REDACTED, School Psychologist

**NAMES AND TITLES OF PERSONS WHO APPEARED VIA TELEPHONE ON 09/23/2021**:

For the Student:

REDACTED, Attorney

For the Department of Education:

REDACTED, Attorney

**NAMES AND TITLES OF PERSONS WHO APPEARED VIA TELEPHONE ON 10/06/2021**:

C - 2

For the Student:

REDACTED, Parent

REDACTED, Attorney

For the Department of Education:

REDACTED, Attorney

REDACTED, Occupational Therapist

**NAMES AND TITLES OF PERSONS WHO APPEARED VIA TELEPHONE ON**

**10/07/2021**:

For the Student:

REDACTED, Attorney

REDACTED, Parent

REDACTED, Director of Special Education Private School

For the Department of Education:

REDACTED, Attorney

REDACTED, School Psychologist

-------------------------------------------------------------------------------------------------------

## Introduction

This matter comes before the undersigned Hearing Officer on Petitioners' Notice of

Due Process Complaint, filed on or about 12/31/2020 (hereinafter, "Complaint").   I was

appointed on 07/19/2021.   On 07/21/2021 an Order of Consolidation was issued

consolidating this case with case 210850.  A pendency order was issued on 08/02/2021.

The hearing was held on 07/29/2021, 08/30/2021, 09/23/2021, 10/06/2021, and

10/07/2021.   It was a closed hearing. Due to the coronavirus pandemic the hearing was

held telephonically and evidence was submitted electronically.  Petitioner was

represented by REDACTED and Respondent was represented by REDACTED.

Petitioner entered into evidence exhibits A thru II (omitting HH).  Respondent entered

into evidence exhibits 1 thru 57.   Both parties submitted written closing statements on

11/03/2021.

## Jurisdiction

The due process hearing was held, and a decision in this matter is being rendered,

pursuant to the Individual with Disabilities Education Act (hereinafter, "IDEA"), 20

U.S.C. § 1400 *et seq*., and its implementing regulations, 34 C.F.R. § 300 *et seq*., and the

New York State Education Law, Educ. Law § 4404 *et seq*., and its implementing

regulations, 8 NYCRR § 200.5 *et seq.*

## Background

Student is a student with a disability who resides with her Parent in an area served by the

NYC DOE.  District has classified Student as a student with Multiple Disabilities.  In

October 2020 Parent unilaterally placed Student in a private program (Parent continued

the unilateral placement thru the 2021/22 school year).  Parent brings this cause of action

asserting a denial of FAPE for the 2017/18 thru 2021/22 school years.  Parent seeks as

relief tuition funding for their unilateral placement of Student at the private school.

District made a motion to dismiss that portion of the claim beyond the statute of

limitations (2017/18 and part of 2018/19).  As the record established that neither of the

two exceptions to the SOL were met in this case, and that procedural safeguards were

provided to Parent, this hearing officer found that the SOL barred a portion of Parent's

claim.  Thus the case at present involves the period of time spanning December 2018

through the 2021/22 school year.

## Issue

Did the District deny Student a free appropriate public education (FAPE) from December 2018 through the 2021/22 school year? If so, what is the appropriate relief to provide Student as a remedy for the District's denial of FAPE?

## Conclusions of Law and Discussion

Based upon the arguments of both parties, as well as this Hearing Officer's own legal research, the Conclusions of Law of this Hearing Officer are as follows:

The central mandate of the IDEA requires that States provide a "free appropriate public education" (FAPE) to students with disabilities (34 C.F.R. §300.101). Districts fulfill this mandate by developing individualized education programs (IEP) that are uniquely designed to meet the needs of students with disabilities and are provided at no cost to parents. The standard which determines whether an IEP placement recommendation is appropriate for a student with a disability was established by the Supreme Court in *Hendrick Hudson Bd. Of Educ. v. Rowley*, 458 U.S. 176, 553 IDELR 656 (1982), wherein the court asked if the state had complied with the IDEA's due process procedures and if the IEP was reasonably calculated to enable the child to receive "educational benefit." If the answer to both of those questions is affirmative, then the placement is appropriate and the FAPE requirement of the IDEA has been met.

The burden of proving whether an IEP has satisfied the *Rowley* test, that it is appropriate and provides a FAPE to the student with a disability, falls upon the local educational agency in New York State [N.Y.Educ.Law §4404(c)(1)]. Hence, in the case at present, the District bears the burden of proving that it offered Student a FAPE. When a parent seeks tuition reimbursement at public expense for the unilateral placement of their child in a nonpublic school the law requires an analysis of 3 issues before relief can

be granted (34 C.F.R. §300.148 and *School Comm. Of Burlington v. Dept. of Educ. Of Mass.* (471 U.S. 359 (1984)).  In *Burlington* the Supreme Court established that the threshold issue to be determined is whether the District provided or denied the student a FAPE.  If the student was denied a FAPE then the burden shifts to the parent to prove that the parent's unilateral placement was appropriate for the student.  Finally, if the parent's unilateral placement is found to be appropriate, an examination of the equities must occur for the purposes of reimbursement.

District presented documentary evidence, the testimony of two school psychologists, and the testimony of Student's occupational therapist to meet their burden of proof.  District's first witness was a school psychologist (SL) who testified solely based upon a document review.  SL did not meet, evaluate, or observe Student – and did not participate in the IEP meetings or author any of the documents collected for those meetings.  SL was unable to comment on why the IEP recommendation for OT was 1x15 as she was not at the meeting, hence the value of her opinion was limited.  SL was not familiar with the 6:1:1 placement site offered to Student but noted that it would not have been appropriate for Student if it contained aggressive, self-abusive, or withdrawn students.  SL did not offer an explanation for District's failure to provide an AT evaluation to Student, who was nonverbal and had severe global delays, until after Student began the private program.  Overall, this hearing officer found SL's testimony to be of limited value as she did not know Student personally, could not comment on the IEP meetings as she did not attend them, could not comment on the recommended placement site, and was unaware of Student's diagnosis of cerebral palsy and how that would impact District's classification of Student.  District's second witness was the OT

who worked with Student in 2019 (JP). JP testified that she changed Student's OT goals because from September to December 2019 the goals were not appropriate. JP further testified that Student's current OT mandate at the private program is appropriate. JP noted that Student's inconsistent attendance presented a challenge because it made it difficult to treat Student, especially in regards to remote OT during COVID. Further, Student's inconsistent attendance impacted the mandate recommended for Student as JP opined that she could not justify allocating an OT resource to a student who attended school inconsistently. This hearing officer found JP to be a qualified and credible witness with personal knowledge of Student. This hearing officer did not find that JP's testimony proved that District provided a FAPE to Student, however her testimony did raise equitable issues (lack of Parent consent, inconsistent attendance) to be discussed later in this Decision. District's final witness was the school psychologist who participated in 2018/19 and 2019/20 IEP meetings at issue in this case (SC). Of note, SC did not evaluate Student as Student was absent on the days SC attempted to do so. SC's testimony reflected on the nature of the contentious relationship between the school and Parent, and the reasons behind some of Student's non-attendance at school. SC noted that issues pertaining to the provision of the mandated transportation professional, Parent's perception of Student's safety at school, and wheelchair issues impacted Student's attendance at school. SC listed her unsuccessful attempts to contact Parent, to obtain a return call or consent for evaluations. Though this hearing officer found SC to be a qualified and credible witness, this hearing officer finds that her testimony failed to address how the time increments of the related service mandates addressed Student's significant needs, whether the implementation issues involving the transportation para

were timely corrected (despite acknowledging the impact on Student's attendance), and why ultimately, despite Parent's lack of consent, more evaluations were not conducted of a student with severe and global deficits. A review of the record reflects that District failed to meet its burden of proving that it provided a FAPE to Student for the school years at issue in this case.

The Supreme Court in *Board of Educ. V. Rowley* (458 U.S. 176 (1982)) determined that the substantive measure of the appropriateness of an educational placement is whether the program is reasonably calculated to confer educational benefit for the student. Educational benefit has been interpreted by the courts to mean progress - in other words, can the student make progress in the educational placement. The burden upon Parent to prove their unilateral placement appropriate is lower than that required of the District. Parent need only prove that the unilateral placement provides instruction designed to meet the unique needs of their student with a disability (Frank G. v. Bd. Of Educ., 459 F.3d 356, 364 [2d Circ. 2006]).

Parent presented documentary evidence, their own testimony, and the testimony of the director of special education at the private program (TS) to meet their burden of proof at hearing. The private program is a program designed to meet the needs of students with brain injuries and brain-based disabilities. The program serves 38-42 students ages 5-21. Every student at the program requires a 1:1 paraprofessional. Related services at the private program are provided in a push-in and pull-out model in 60 minute increments to allow for transferring and repositioning needs, breaks, and repetition. The program offers a 12-month program and has extended school hours. Student is placed in a 6:1:1 class with peers of similar profile to her in academic functioning, age, impaired mobility, dependency on assistive technology, and g-tube

feeding,   The program provides Student with a 1:1 para.  An extensive individualized program was developed by the program to meet Student's unique needs.  The record reflects that Student is making progress towards her goals at the program.  TS testified that she personally observed Student multiple times and noted Student progress across domains including academic, social, and related services.  A review of the record reflects the individualization of Student's program to meet her needs and evidence of progress.  As such, this hearing officer finds Parent's unilateral placement appropriate as it was reasonably calculated to enable Student to receive educational benefit and indeed produced that benefit for Student.

An analysis of the equities in this case reveals that intervening factors mitigate District's failure.  The record reveals a contentious relationship between Parent and District.  Poor student attendance, lack of parental consent to evaluations, lack of parental response to communication efforts and requests by District – may have contributed to District's ability to provide special education services.  Though the record is not conclusive to the reason, the record does indicate a lack of full participation by Parent in the special education process.  The lack of a clear record regarding Student's attendance at the private school also calls into question the credibility of reasons proffered for Student's attendance issues at the public placement.  It is reasonable to conclude that Student's poor attendance may have contributed to her experience and rate of progress at school.  As such, this hearing officer finds equitable considerations support reduction of Parent's requested relief.  Tuition funding will be limited to current dates of attendance and not extend eligibility as requested by Parent.

**<u>ORDER</u>**

As I find the District denied Student a FAPE it is HEREBY ORDERED that the following relief be GRANTED to Parent:

Tuition funding for the placement of Student at the private program from October 2020 through the 2021/22 school year to include provision of special transportation and related services.  District shall provide Student with evaluations for vision services and assistive technology within 60 days of the date of this Decision.

SO ORDERED.

DATED: November 30, 2021

------------------------------

Helene Peyser

Impartial Hearing Officer

-------------------------------------------------------------------------------------------------------------

PLEASE TAKE NOTICE

Within 40 days of the date of this decision, the parent and/or the New York City Department of Education has a right to appeal the decision to the State Review Officer of the New York State Education Department under Section 4404 of the Education Law and the Individuals with Disabilities Education Act.

If either party plans to appeal the decision, a notice of intention to seek review shall be personally served upon the opposing party no later than 25 days after the date of the decision sought to be reviewed.

An appealing party's request for review shall be personally served upon the opposing party within 40 days from the date of the decision sought to be reviewed. An appealing party shall file the notice of intention to seek review, notice of request for review, request for review, and proof of service with the Office of State Review of the State Education Department within two days after service of the request for review is complete. The rules of procedure for appeals before an SRO are found in Part 279 of the Regulations of the Commissioner of Education. A copy of the rules in Part 279 and model forms are available at http://www.sro.nysed.gov.

---------------------------------------------------------------------------------------------------

DOCUMENTATION ENTERED INTO THE RECORD

PARENT:

| | | | |
|---|---|---|---|
| A | 12/31/2020 | Due Process Complaint – IH # 205442 2020-21 School Year | 10 |
| B | 07/06/2021 | Due Process Complaint – IH # 210850 2021-22 School Year | 9 |
| C | 08/02/2021 | Order on Pendency IH # 205442 | 3 |
| D | 01/02/2020 | NYC DOE Prior Written Notice | 3 |
| E | 10/04/2020 | iBRAIN Enrollment Contract 2020-21 School Year | 10 |
| F | 10/15/2020 | Transportation Affidavit 2020-21 School Year | 1 |
| G | 11/13/2020 | iBRAIN Quarterly Progress Report | 10 |
| H | 02/18/2021 | iBRAIN IEP | 48 |
| I | 02/19/2021 | Medication Administration Forms | 17 |
| J | 06/16/2021 | NYC DOE Prior Written Notice & School Location Letter | 10 |
| K | 06/23/2021 | Ten Day Notice 2021-22 School Year | 2 |
| L | 06/27/2021 | iBRAIN Enrollment Contract 2021-22 School Year | 7 |
| M | 07/15/2021 | NYC DOE Determination Report | 1 |
| N | 07/22/2021 | Transportation Affidavit 2021-22 School Year | 1 |
| O | 2021-2022 | iBRAIN Schedule 2021-22 School Year | 1 |
| P | 01/16/2017 | NYC DOE IEP | 18 |
| Q | 01/18/2019 | NYC DOE IEP | 15 |

| | | | |
|---|---|---|---|
| R | 12/18/2019 | NYC DOE IEP | 16 |
| S | 08/23/2021 | Maylene Otero Affidavit | 4 |
| T | 08/23/2021 | Tiffany Semm Affidavit | 4 |
| U | 08/13/2013 | Letter from NYS Education Dept. regarding music therapy | 2 |
| V | 08/30/2021 | Description of 6:1:1 Classes at Lewis and Clark School | 3 |
| W | 08/30/2021 | NYSED Questions and Answers regarding IEPs and Special Ed services | 13 |
| X | 2021 | P.S. X12 Lewis and Clark School Accessibility Profile | 2 |
| Y | 2021 | NYC DOE Assistive Technology Information | 7 |
| Z | 2021 | P.S. X12 Lewis and Clark School Information reflecting "No Accessibility" | 3 |
| AA | 2021 | NYC DOE Qualifications for Vision Services form | 3 |
| BB | 09/02/2021 | Medical Letter from NY Presbyterian regarding ▮▮▮▮ medical and educational history | 2 |
| CC | 10/15/2019 | Letter from Parent requesting an IEP Meeting | 1 |
| DD | 10/15/2019 | Letter from Parent to DOE regarding concerns about school staff and ▮▮▮▮ well-being | 1 |
| EE | 10/18/2019 | Text message and picture regarding ▮▮▮▮ injury at school | 1 |

| FF | 11/12/2019 | Letter from Parent requesting an emergency IEP Meeting | 1 |
|----|-----------|-----------------------------------------------------------|---|
| GG | 11/13/2019 | Letter from Parent requesting an IEP Meeting | 1 |

| HH | omitted | | |
|----|---------|---|---|
| II | 09/10/2021 | Letter from Social Worker | 2 |

DEPARTMENT OF EDUCATION:

| 1 | IEP (15-16) | 02/12/2015 | 16 |
|---|-------------|-----------|-----|
| 2 | IEP (17-18) | 01/16/2017 | 23 |
| 3 | Prior Written Notice (17-18) | 02/13/2017 | 7 |
| 4 | IEP (18-19) | 01/16/2018 | 22 |
| 5 | Prior Written Notice (18-19) | 02/14/2018 | 7 |
| 6 | Consent for Initial Evaluation | 08/13/2012 | 1 |
| 7 | Notice of Recommendation | 11/12/2013 | 1 |
| 8 | IEP (13-14) | 09/08/2013 | 17 |
| 9 | Notice of IEP Meeting | 01/05/2017 | 5 |
| 10 | Notice of IEP Meeting | 01/26/2017 | 5 |
| 11 | Physical Therapy Clinical Guide | 02/06/2017 | 2 |
| 12 | Speech-Language Referral | 03/07/2017 | 1 |
| 13 | Occupational Therapy Clinical Guide | 06/08/2017 | 2 |
| 14 | Speech-Language Referral | 09/25/2017 | 1 |
| 15 | Notice of IEP Meeting | 12/11/2017 | 5 |
| 16 | Notice of IEP Meeting | 12/12/2017 | 5 |
| 17 | Occupational and Physical Therapy Clinical Guide | 02/28/2018 | 2 |
| 18 | Speech-Language Referral | 04/24/2018 | 1 |
| 19 | Physical Therapy Guide | 05/2018 | 2 |
| 20 | Speech-Language Referral | 09/17/2018 | 1 |
| 21 | Assessment Planning | 01/2019 | 1 |
| 22 | Progress Report | 01/2019 | 2 |
| 23 | Mandated Three Year Reevaluation | 01/03/2019 | 2 |
| 24 | Notice of IEP Meeting | 01/07/2019 | 5 |
| 25 | Individualized Education Program (IEP) | 01/18/2019 | 23 |
| 26 | Occupational and Physical Therapy Clinical Guide | 01/18/2019 | 2 |
| 27 | Prior Written Notice Package | 01/24/2019 | 7 |
| 28 | Consent for Additional Assessments | 10/23/2019 | 1 |
| 29 | Notice of IEP Meeting | 12/09/2019 | 5 |
| 30 | Progress Report | 12/17/2019 | 2 |

C - 13

| 31 | Individualized Education Program (IEP) | 12/18/2019 | 27 |
|----|----------------------------------------|------------|----|
| 32 | Occupational and Physical Therapy Clinical Guide | 12/18/2019 | 2 |
| 33 | Prior Written Notice Package | 01/02/2020 | 7 |
| 34 | Speech Language Referral | 01/13/2020 | 1 |
| 35 | Remote Learning Plan | 03/18/2020 | 2 |
| 36 | Consent for Tele-Therapy | 03/30/2020 | 1 |
| 37 | Consent for Tele Therapy | 04/06/2020 | 1 |
| 38 | Special Education Remote Learning Plan | 04/08/2020 | 2 |
| 39 | Consent for Tele-Therapy | 04/21/2020 | 1 |
| 40 | Notice of IEP Amendment | 05/13/2020 | 5 |
| 41 | Individualized Education Program (IEP) | 05/21/2020 | 27 |
| 42 | Consent for Tele-Therapy | 09/16/2020 | 1 |
| 43 | Special Education Program Adaptations Document for Blended and Remote Learning | 09/21/2020 | 7 |
| 44 | Related Service Adaptions for Blended and Remote Learning | 10/10/2020 | 3 |
| 45 | iBrain Quarterly Progess Report | 11/13/2020 | 10 |
| 46 | Request for Reevaluation | 12/04/2020 | 1 |
| 47 | Prior Written Notice Reevaluation | 12/04/2020 | 6 |
| 48 | Notice of IEP Meeting | 12/21/2020 | 3 |
| 49 | Notice of Social History | 01/05/2021 | 3 |
| 50 | Notice of Social History | 01/22/2021 | 3 |
| 51 | Individualized Education Program (IEP) | 02/23/2021 | 46 |
| 52 | IEP Meeting Minutes | 02/24/2021 | 2 |
| 53 | Prior Written Notice Package | 06/16/2021 | 10 |
| 54 | DOE Subpoena Request | 08/19/2021 | 4 |
| 55 | iBrain Subpoena Response | 08/26/2021 | 5 |
| 56. | Events Log | Various | 43 |
| 57 | SC Affidavit | 10/05/2021 | 8 |

C - 14

### L.V. v. NYC Department of Education, 03 Civ. 9917 (SDNY)

Parents of children with Individualized Education Programs who received or who may receive an order at the conclusion of an impartial hearing should read the attached notice about possible disclosure of information and documents about their children as part of a federal court litigation.

Translations in Spanish, Arabic, Bengali, Chinese, French, Haitian Creole, Korean, Russian, and Urdu are available on the DOE webpage at https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings

**Notice of Potential Disclosure of Student Education Records**

**Please read this notice carefully**. This is a message about possible disclosure of documents or data that might contain information about your child, if your child has been classified as a student with a disability and has been or may be the subject of a final Impartial Hearing Order.

**I.      Nature of the Lawsuit**

This lawsuit challenged the failure of the Department of Education ("DOE") of the City of New York to timely implement orders issued by impartial hearing officers in connection with impartial hearings held pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.* and N.Y. Education Law § 4401, *et seq.* In 2007, the parties entered into a Stipulation of Settlement (the "Stipulation") in which the DOE agreed to timely implement these orders.

In January 2021, the Court granted plaintiffs' motion for the appointment of a special master. On April 14, 2021, the Court entered an Order appointing David Irwin of Thru-Ed as the Special Master.  On May 14, 2021, the Court entered an Order detailing the duties and authority of the Special Master which include, among other things, the authority to review DOE's processes for implementing impartial hearing orders and to recommend to the Court improvements to enable DOE to timely implement orders a. Pursuant to this Order, the Special Master may have access to education records of students, upon DOE's compliance with the Family Education Rights and Privacy Act (20 U.S.C. § 1232g; 34 C.F.R. Part 99) ("FERPA").

## II.    Data Ordered to Be Disclosed

In order for the Special Master to perform his duties, the Court has directed the DOE to provide the Special Master (and employees and consultants at Thru-Ed) with access to records containing confidential student record information, including, but not limited to, documents submitted in the impartial hearing process, impartial hearing orders, data about compliance, and students' special education documents, such as individualized education programs, evaluations, authorizations, invoices, etc. The Special Master is required to keep any student documents and information confidential. No student-specific information will be shared with plaintiffs' counsel unless the student's parent specifically consents. If there is any student-specific information in the Special Master's reports to the Court, that information would not be made public.

The Special Master will use this information only for his work to review DOE's processes for implementing impartial hearing orders and to recommend to the Court improvements to enable DOE to timely implement orders.  The disclosure of this information <u>does not</u> affect any of your rights as a parent to seek special education services for your child.

## IV.    Objections to Disclosure

If you agree to the disclosure of this information to the Special Master, you do not need to do anything more.

If you do not want your child's information shared with the Special Master, you must object to this disclosure by submitting an objection to DOE's attorney, addressed to:

> Jeffrey S. Dantowitz
> NYC Law Department
> 100 Church Street, Room 2-121
> New York  NY  10007

or via email at LVObjection@law.nyc.gov.  Please reference the *LV v. DOE* lawsuit (Case No. 03-9917) when writing.  An Objection Form accompanies this Notice, though no written objection will be rejected if it is not submitted on this form.  If you object, no records containing you and your child's personally identifiable information or other FERPA-protected information will be provided to the Special Master, although nominal and incidental disclosure of your child's name may occur.  **Any objections must be received by December 3, 2021 or for impartial hearing orders issued after November 12, 2021, within 3 weeks of the issuance of the impartial hearing order**.

**If you would like more information about this notice, please contact the attorneys for plaintiffs**, **Rebecca Shore, of Advocates for Children of New York, Inc. at 646-532-6078.**

C - 16

**OBJECTION TO DISCLOSURE OF RECORDS**
**LV v. DOE, 03 Civ. 9917 (SDNY)**

If you agree to the release of information about your child to the Special Master appointed in *L.V. v. DOE*, you do not need to complete this form.

If you object to the release of information about your child to the Special Master appointed in *L.V. v. DOE*, please compete and return this form to:

> Jeffrey S. Dantowitz
> NYC Law Department
> 100 Church Street, Room 2-121
> New York, NY  10007

or via email at LVObjection@law.nyc.gov

Child's name: _____

Name: _____

Address: _____

Impartial Hearing Order Case # (if known): _____

Date of Order (if known): _____

If you object to the release of your confidential information, please check the line below:

_____    I do not agree to have my confidential records disclosed to the Special Master in *L.V. v. DOE*.

_____                    _____
            Date                                             Please sign here

C - 17

If you object to the release of information, your objection must be received by December 3, 2021 or, for impartial hearing orders issued after November 12, 2021, within 3 weeks of the issuance of the impartial hearing order.

    \*   \*   \*   If you do not notify the DOE of your objections to the documents being released, you child's information will be provided to the Special Master appointed in *LV v. DOE*, 99 Civ. 9917 (SDNY) and/or consultants and employees of Thru-Ed. The information will remain confidential and the disclosure of this information will not affect any of your rights to seek special education services for your child.

C - 18

| |
|---|
| للاطلاع على هذا المستند باللغة العربية قم بزيارة الموقع الإلكتروني https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings |
| Yg/Ñ Ñ̀ à Å nà'l à̀, https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings nà'p̂ |
| 若要以中文查看，請上網到 https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings |
| Pour consulter ce texte en français, allez sur https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings |
| Pou wè tèks sa a an kreyòl ayisyen, ale sou https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings |
| 본 문서를 한국어로 보시려면 다음 웹사이트를 이용하십시오: https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings |
| *Для просмотра документа на русском языке посетите https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings* |
| Para ver este contenido en español, visite https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings |
| اس دستاویز کو اردو میں دیکھنے کے لیے https://www.schools.nyc.gov/learning/special-education/help/impartial-hearings پر جائیں |

NEW YORK CITY OFFICE OF ADMINISTRATIVE
TRIALS AND HEARINGS (OATH)
SPECIAL EDUCATION HEARINGS DIVISION
----------------------------------------------------------------X
In the Matter of the Due Process Complaint of
Maylene Otero ("Parent"), as Parent/Guardian
of  K.R.O. ("Student"), and Individually;

                                Petitioners,                       **<u>ORDER OF PENDENCY</u>**

    -against-

 **THE NEW YORK CITY DEPARTMENT**             **IHO Case No.**

**OF EDUCATION,**                              **IHO**

                      Respondent.
----------------------------------------------------------------X

This Order addresses a Student with disabilities whose Parent challenges the Individualized Educational Program ("IEP") and placement proposed for the 2024-2025 extended school year by Respondent The New York City Department of Education ("DOE"). Through this Order, the Parent seeks to enforce the Student's pendency rights under § 1415(j) of the Individuals with Disabilities Education Act ("IDEA") and Section 4404(4) of the New York State Education Law, which entitle the Student to remain in his/her current educational placement, at public expense, during the pendency of their administrative and/or judicial proceeding.

Under IDEA, the pendency inquiry identifies the Student's then-current educational program/placement. *Mackey v. Bd. of Educ., Arlington C.S.D.*, 386 F.3d 158 (2d Cir. 2004), *supplemented*, 112 F. App'x 89 (2d Cir. 2004). Although not defined by statute, the phrase "then current educational placement" has been found to mean the last agreed-upon placement at the moment when the due process proceeding is commenced. *Murphy v. Arlington C.S.D.*, 86 F. Supp. 2d 354 (S.D.N.Y. 2000), *aff'd,* 297 F.3d 195 (2d Cir. 2002).

The Student's "last agreed upon placement" is at the International Academy for the Brain ("iBRAIN"). This placement is based upon the Unappealed FOFD IHO Case No. 205442, 11/20/2021, which found that: 1) DOE denied Student a FAPE; 2) iBRAIN was appropriate for Student; and, 3) equitable considerations supported a full award of direct payment of tuition and related services, including special transportation and nursing services, for Student at iBRAIN.

Unless otherwise excluded, Pendency includes all costs of special education and related services, including transportation. Under the IDEA, "related services" include transportation, and under N.Y. Educ. Law, "special education" includes transportation. When a student receives special education services, an order on pendency– without transportation—would render the award meaningless.

For the preceding reasons, it is hereby ORDERED that effective July 2, 2024, and during the pendency of all Due Process Proceedings relative to IHO Case No.        the 2024-2025 Extended School Year, and all administrative and judicial proceedings thereafter, the DOE shall fund the Student's placement at iBRAIN. This placement includes the following:

- Funding for the cost of Full Tuition to be paid directly to the International Academy for the Brain ("iBRAIN") pursuant to the enrollment agreement between the Parent-Petitioner and iBRAIN (see Exhibit E in Petitioners Due Process Complaint) as outlined in Petitioner's Due Process Complaint; and
- Funding for transportation services, as well as all services necessary to said transportation, to be paid directly to the transportation provider pursuant to the transportation contract between the Parent-Petitioner and the transportation company (see Exhibit F in Petitioners Due Process Complaint) as outlined in Petitioner's Due Process Complaint; and
- Funding for nursing services to be paid directly to the nursing service provider pursuant to the nursing contract between the Parent-Petitioner and nursing services provider (see Exhibit G in Petitioners Due Process Complaint) as outlined in Petitioner's Due Process Complaint.

Dated: _____        So Ordered: _____
                                            IHO

2

D - 2



Phone - 646-315-1548
Email - info@iBrainNYC.org
Web - www.iBrainNYC.org

**ANNUAL ENROLLMENT CONTRACT**

This is a contract ("Enrollment Contract" or "Agreement") between Maylene Otero ("Parent(s)/Guardian(s)") and The International Academy for the Brain, dba iBRAIN Ltd ("*i*Brain") for the enrollment of ▮▮▮▮ ▮▮▮▮ ("Student") for the 2024 - 2025 school year ("School Year"). The parties hereby agree to the following terms:

<u>Enrollment Period</u>

1. *i*Brain offers enrollment to Student for the extended school year ("School Year"), starting on July 2, 2024, and ending on June 27, 2025, subject to the terms and conditions set forth below.

<u>Academic Program, Related and Other Services</u>

2. Parent(s)/Guardian(s) attests they have reviewed the curriculum program for *i*Brain's educational and related services programs and certain related materials.

3. Parent(s)/Guardian(s) understands the academic and related service programs for Student for the School Year will be provided as follows:

    a. *i*Brain will provide the academic and related service programming as outlined in: (i) Student's most recent Individualized Education Program ("IEP") issued by the Student's local school district; or (ii) recommend an academic program that will be outlined in Student's *i*Brain IEP if the local school district's IEP has not been updated or if *i*Brain and Parent(s)/Guardian(s) disagree with the proposed academic program recommendation in Student's IEP issued by the local school district for the academic year. Where *i*Brain recommends changes to the Student's recent IEP, *i*Brain assumes all responsibility to defend against all challenges to the appropriateness of the changes it makes to Student's academic programming as reflected on the most recent IEP.

<u>Tuition, Deposit and Related Service Fees</u>

4. **Deposit:**  Parent(s) agrees to pay an initial, non-refundable deposit of $100 ("Deposit") made payable to "International Academy for the Brain" for the 2024-2025 school year. The Deposit will be applied against the Full Tuition as outlined in Sections 7 and will be due the first day of school.

5. **Base Tuition Fees:** Base Tuition Fee for the *i*Brain program is **$213,000** for the School Year starting on July 2, 2024 and ending on June 27, 2025. The Base Tuition includes the cost of an individual paraprofessional, and school nurse as well as the academic programming outlined in Section 3.

6. **Supplemental Tuition Fees:** The Base Tuition cost does not include the cost of related services, transportation paraprofessional, any individual nursing services or assistive technology devices and

Manhattan: 403 East 91st Street
New York, NY 10128
Brooklyn: 213 48th Street
Brooklyn, NY 11220

E - 1

equipment. Supplemental Tuition includes the cost of the Student's related services programming such as physical therapy, occupational therapy, speech-language therapy, vision education services, assistive technology services, music therapy, hearing education services and parent counseling and training as outlined in Section 3. The total Supplementary Tuition Fees for the 2024-2025 school year is **$130,100.60.**

7. **Full Tuition:** Full Tuition for the 2024-2025 academic year is inclusive of Base Tuition Fees as described in Section 5 and Supplemental Tuition Fees as described in Section 6. The Full Tuition is **$343,100.60** shall be paid in three installments with the first payment of **$58,465.57** due by July 2, 2024, the second installment payment of **$109,238.31** due by September 5, 2024, and the third payment of **$175,396.72** due by January 2, 2025.

## **Payment Terms**

8. **Payment Obligation**:  It is understood and agreed the enrollment of Student is for the full academic year and the obligation to pay tuition cannot be apportioned or mitigated except as expressly provided for herein. *i*Brain will not make any deductions, omissions, or refunds for excused or unexcused absences, withdrawal, suspension, or for any other reason, except as outlined in Sections 10 and 11.

It is understood Parent(s)/Guardian(s) may seek public funding from their local school district to pay for Student's Full Tuition due to *i*Brain for the School Year by asserting Student's due process rights.  In the event Parent(s)/Guardian(s) is required to file a due process complaint against the local school district seeking an Order on Pendency and/or Findings of Fact and Decision for funding, the tuition payment obligations will be suspended, except those obligations outlined in sections 8(a) and 8(b), until a final determination/decision is issued by an impartial hearing officer, state review officer, or state or federal court, and then all monies then-due will become immediately due within thirty (30) days of the final adjudication.

   a.  **Pendency Placement - Payment Obligations**: It is understood Parent(s)/Guardian(s) may seek public funding from the local school district to pay for Student's Full Tuition due to *i*Brain for the School Year by asserting Student's Due Process Rights under 20 U.S.C. § 1415[j], whereby the local school district is required to maintain Student in his/her last-agreed upon placement during the pendency of any impartial hearing proceedings ("Stay-put") which is automatic upon filing a Due Process Complaint ("DPC"). Upon filing the DPC and asserting the Stay-put provision ("DPC Date"), the payments obligations as outlined in this Enrollment Contract shall be due within 30 days of DPC Date, according to the terms herein. Payment obligations shall remain in effect until the Stay-put rights are no longer active.

   In the event the local school district does not comply with the Stay-put rights of Student and fails to make the payment obligations as outlined in this Enrollment Agreement, Parent(s) /Guardian(s): (1) may seek immediate enforcement of the Stay-put rights in state or federal court and MUST provide a payment schedule within two weeks of such enforcement action; (2), if Parent(s)/Guardian(s) does not seek enforcement within 14 days of the payment obligations becoming due, Parent(s)/Guardian(s) will be required to execute a payment schedule while the Student remains at iBRAIN; or, (3) Parent(s)/Guardian(s) will be required to establish payment plan and may withdraw Student by terminating contract per section 11.

   b.  **Order on Pendency Denied - Payment Obligations:**  It is understood Parent(s)/Guardian(s) may seek public funding from the local school district to pay for Student's Full Tuition due iBrain for the School Year by asserting Student's Due Process Rights under 20 U.S.C. § 1415[j], whereby the

E - 2

Document Ref: PAEND-TRA2U-AZSD8-N5P6B

local school district is required to maintain Student in his/her last-agreed upon placement during the pendency of any impartial hearing proceedings ("Stay-put") is automatic upon filing a Due Process Complaint ("DPC"). In the event Parent(s)/Guardian(s) seeks and is denied an Order on Pendency by an Impartial Hearing Officer, State Review Officer, or a state or federal court, for all or part of the Full Tuition funding from the local school district due under this Enrollment Contract, Parent(s)/Guardian(s) will be permitted to immediately withdraw Student from iBrain by terminating this contract per Section 11 within 30 days of receipt of the Order on Pendency. Parent(s)/Guardian(s) will be required to execute a payment schedule to comply with the contractual obligations based upon the financial need of Parent(s)/Guardian(s) for any balances due to iBrain on the date of withdrawal.

c. Late Payment Penalty. Upon the failure to pay in full any payment obligation due based on the terms of this Enrollment Contract ("Amount Outstanding") within seven (7) business days of the due date for such payment, a late payment penalty of ten percent (10.0%) of the Amount Outstanding (the "Late Payment Amount") shall immediately be added to the Amount Outstanding. The imposition of the Late Payment Amount shall be in addition to any other rights and remedies of iBRAIN under this Agreement. Any balances of any amount which remains unpaid, i.e., Amount Outstanding, including any Late Payment Amount, more than thirty (30) days after it is due shall accrue interest until paid at the rate equal to the lesser of two percent (2.0%) per calendar month or the maximum amount allowed under Applicable Law. However, in no event shall this interest provision be construed as a grant of permission for payment delays.

9. **Failure to Secure Tuition Funding:** In the event Parent(s)/Guardian(s) seeks a Findings of Fact and Decision, but is denied all or part of the Full Tuition funding from the local school district due under this Enrollment Contract by a final administrative or judicial decision, including all state and federal appeals resolving the claim for such funding, Parent(s)/Guardian(s) will be permitted to immediately withdraw Student from iBrain by terminating this contract per Section 11.

## Contract Release and Termination

10. **Release:**  Parent(s)/Guardian(s) acknowledges that Parent(s)/Guardian(s) will be released from this Enrollment Contract without financial penalty or continuing responsibility for tuition payments outlined in this Enrollment Contract should the local school district offer a free appropriate public education to Student by the first day of the School Year as indicated in Section 1 and the Parent(s)/Guardian(s) provides notice as outlined in Section 11 prior to the first day of the School Year. Parent(s)/Guardian(s) may be released from this Enrollment Contract if the Student relocates outside of the local school district, or, if due to health reasons, Student is no longer able to attend iBrain, and Parent(s)/Guardian(s) provides notice as outlined in Section 11.

11. **Termination:**  Parent(s)/Guardian(s) may terminate this Enrollment Contract by submitting a written Termination Notice per Section 25. The Termination Notice must, (a) be in writing, (b) dated, (c) state Student's name and (d) provide Parent(s)/Guardian(s)'s reasons for terminating the Enrollment Contract. The Termination Notice may be sent through the U.S. Postal Service via certified mail, return receipt, or Federal Express delivery service or by courier. If submitted through the U.S. Postal Service by First Class Mail, the Termination Notice shall be deemed received by iBrain five business days after the date that the Termination Notice is postmarked, consistent with Section 25.

If Parent(s)/Guardian(s) terminates this Enrollment Agreement, Parent(s)/Guardian(s) will forfeit Student's non- refundable Tuition Deposit set forth in Section 4 in its entirety and any other payments made per the

E - 3

Document Ref: PAEND-TRA2U-AZSD8-N5P6B

terms of this Enrollment Agreement.

Applicable tuition refunds, if any, shall be determined as follows:

A.  All pre-paid tuition fees will be refunded *if and only if* the written Termination Notice in the form stated above was RECEIVED on or before the first day of attendance by Student.

B.  If written Termination Notice is received after the Student's first day of attendance, Parent(s)/Guardian(s) will be responsible for paying all tuition fees for the calendar month in which Termination Notice is received on a *pro rata* basis.  Parent(s)/Guardian(s) also will be responsible for paying all outstanding tuition and fees then due and owing, if any, for all months prior to the month in which Termination Notice is received.  All such fees shall be paid within ten (10) calendar days after Termination Notice is received by *i*Brain.

## School/Family Cooperation

12. **Parent(s)/Guardian(s) Must Cooperate with School District:**   In the event Parent(s)/Guardian(s) decides to seek direct funding from their local school district for the Student's placement and related services at *i*Brain, Parent(s)/Guardian(s) agrees to take all necessary steps to secure funding and to cooperate fully in the process required to secure such funding. In the event that Parent(s)/Guardian(s) does not cooperate with the process, *i*Brain may elect, upon 60 days' notice, to terminate Student's enrollment at *i*Brain.

## Conditions of Enrollment

13. Parent(s)/Guardian(s) hereby authorizes *i*Brain to conduct any interviews, medical examinations, psycho-educational evaluations, and/or related service evaluations necessary for the continued assessment related to Student; and Parent(s)/Guardian(s) authorizes *i*Brain to make necessary information regarding Student available to its staff and/or other paid or unpaid individuals working for or on behalf *i*Brain, including medical and dental consultants and other health care or educational professionals.

14. Parent(s)/Guardian(s) understands that *i*Brain will provide clinical and training services for the community and hereby authorize and consent to the provision of such services, including without limitation, observation, information sharing and trainee participation to the extent *i*Brain deems necessary for training students and staff of other agencies, as well as volunteers, and *i*Brain agrees to use discretion in selecting trainees and sharing information related to Student and to ensure that staff are made aware of the confidentiality of these matters.

15. **Compliance with Local School District Requirements**:   Parent(s)/Guardian(s) and *i*Brain agree to cooperate with respect to their interaction with the New York State Education Department and/or their local school district to ensure compliance with applicable laws, regulations and rules.

16. **Medical Releases**:   Parent(s)/Guardian(s) agrees to promptly sign a Health Insurance Portability and Accountability Act ("HIPAA") release form and a Family Educational Rights and Privacy Act ("FERPA") release form for the purpose of allowing *i*Brain to communicate with Student's related service therapists and medical providers and have access to Student's medical and therapy providers' records. Parent(s)/Guardian(s) agrees to inform *i*Brain if there are any changes to Student's medical conditions and/or changes to Student's medication regimen. Parent(s)/Guardian(s) further agrees that such information obtained or developed by *i*Brain may be used for research and published accordingly.

E - 4

Document Ref: PAEND-TRA2U-AZSD8-N5P6B

17. **Physical Restraint**:  Parent(s)/Guardian(s) authorizes *i*Brain to use the amount of passive physical restraint believed to be reasonable under the circumstances (and endeavor to use the least amount of such restraint), and utilize environmental time out and/or apply a protective device as necessary to ensure the safety of the Student,  staff, and any individual working with the Student in the event Student may cause or reasonably demonstrate a threat of causing injury to self or others, or serious damage to property.

18. Parent(s)/Guardian(s) authorizes *i*Brain to include names, address, telephone number and email addresses in the Family and Staff Membership List to facilitate reasonable communication among families and area support groups for the families.

19. **Consent to Photograph, Video, Record and Interview**:  Parent(s)/Guardian(s) understands Student may be filmed by *i*Brain in individual or group sessions, during recreational activities and/or during community outings; and Parent(s)/Guardian(s) agrees to promptly sign a Communications Release granting *i*Brain all rights to publicly exhibit or display photographs and/or photographic slide projections and/or video of Student and/or to permit use thereof by or in any media, including, but not limited to copyright status (or common law copyright) and, staff members may photograph or film Student for the purpose of keeping personal mementos of their time together with Student.

20. Parent(s)/Guardian(s) authorizes *i*Brain to display or enter Student's artwork or original creation(s) in appropriate competitions including public and private exhibitions; and Parent(s)/Guardian(s) authorizes Student to attend trips and events outside of the school setting with appropriate staff support.

21. **Access to Student's Records**:  Parent(s)/Guardian(s) has the legal right to inspect and review any educational records relating to Student as well as a legal right to a copy of Student's school files, and Parent(s)/Guardian(s) agrees to reimburse *i*Brain for reasonable copying costs associated with such request.

**<u>Miscellaneous Terms</u>**

22. **Assignment**:  Parent(s)/Guardian(s) agrees this Enrollment Contract may be assigned or transferred by *i*Brain and it will be binding upon and inure to the benefit of the successors and assigns of *i*Brain.
    a.  Assignment of Right to Sue. In the event the local school district, or another entity ("Obligor"), is obligated by administrative or court order to make payment(s) to iBRAIN on behalf of the Parent(s)/Guardian(s) ("Assignor") under the terms of this Agreement and fails to make such payment(s) within thirty-five (35) days upon becoming due ("Outstanding Financial Obligation"), at the written request of iBRAIN, the Parent(s)/Guardian(s) shall assign and transfer to iBRAIN ("Assignee") the title and ownership to such claim and cause of action that exists in Parent(s)/Guardian(s) favor against any such entity and thereby authorize iBRAIN to prosecute said action to resolve said claim at iBRAIN's discretion. Assignor understands that whatever amounts Assignee does not collect from Obligor (whether it be all or part of what is due) shall be paid by Assignor as per the terms of the Agreement.

23. **Severability**:  *i*Brain and Parent(s)/Guardian(s) agree in the event any provision of this Enrollment Contract shall become invalid or unenforceable, in whole or in part, for any reason whatsoever, the remaining provisions shall, nevertheless, be valid and binding as if such invalid or unenforceable provision had not been contained in this Enrollment Contract.

24. **Governing Law**:  This Enrollment Contract shall be governed by, construed and enforced in accordance

E - 5

Document Ref: PAEND-TRA2U-AZSD8-N5P6B

with, the substantive laws of New York State, without regard to any conflicts of law provisions thereof that would result in the application of the laws of any other jurisdiction. New York State shall be the jurisdiction and venue for any dispute involving this Enrollment Contract. The Enrollment Contract may be executed in counterpart with facsimile or electronic copies of signatures that shall serve as acceptable substitutes for original signatures and shall be legally binding.

25. **Notice**:  By executing this Enrollment Contract, each party agrees hereto to the terms set forth above and all notices required under this Enrollment Contract shall be delivered via the U.S. Postal Service via certified mail, return receipt, or Federal Express delivery service, or by courier to the following parties at the address set forth below:

International Academy for the Brain
ATTN: Mr. Kieran Lavin
55 West 116th Street, #159
New York, New York 10026

26. **Merger**:  This Enrollment Contract contains the entire understanding between the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written, except as herein contained. The express terms herein control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof. This Enrollment Contract may not be modified or amended other than by an agreement in writing, duly signed by all parties.


By signing below, Parent(s)/Guardians acknowledges that he/she/they have read this Enrollment Contract, understand(s) the terms and conditions, and agree(s) to the conditions outlined in this Enrollment Contract. It is further understood that any questions concerning these conditions have been discussed.


Parent(s)/Guardian(s) signature below signifies that he/she/they have read and understand all aspects of this Enrollment Contract and recognize the legal responsibilities in regard to this Enrollment Contract.


**International Academy for the Brain**          **Parent/Guardian**

X_ *Kieran Lavin*                                X_ *Maylene Otero*

By: Kieran Lavin                                 Name(s): Maylene Otero

International Academy for the Brain              Parent(s)/Guardian(s) of: ▉▉▉


Date: 2024-06-21                                 Date: 2024-06-20

E - 6

Document Ref: PAEND-TRA2U-AZSD8-N5P6B

# Signature Certificate

Reference number: PAEND-TRA2U-AZSD8-N5P6B

| Signer | Timestamp | Signature |
|--------|-----------|-----------|
| **Maylene Otero**<br>Email: omaylene@gmail.com | | |

**Maylene Otero**
Email: omaylene@gmail.com

Sent: 18 Jun 2024 19:55:11 UTC
Viewed: 20 Jun 2024 14:10:04 UTC
Signed: 20 Jun 2024 14:10:23 UTC

**Recipient Verification:**
✔ Email verified          20 Jun 2024 14:10:04 UTC

*Maylene Otero*

IP address: 165.155.132.113
Location: Brooklyn, United States

---

**Kieran Lavin**
Email: kieran@kieranlavin.com

Sent: 18 Jun 2024 19:55:11 UTC
Viewed: 21 Jun 2024 21:15:45 UTC
Signed: 21 Jun 2024 21:15:56 UTC

**Recipient Verification:**
✔ Email verified          21 Jun 2024 21:15:45 UTC

*Kieran Lavin*

IP address: 163.116.135.119
Location: New York, United States

---

Document completed by all parties on:
21 Jun 2024 21:15:56 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature solution trusted by 50,000+ companies worldwide.



### SCHOOL TRANSPORTATION ANNUAL SERVICE AGREEMENT

This annual agreement, hereinafter referred to as "AGREEMENT", is made and entered into by and between MAYLENE OTERO, hereinafter referred to as "CLIENT", Parent(s)/Guardian(s) of ███████ ███████, hereinafter referred to as "STUDENT" residing at ███████████████████████, hereinafter referred to as "HOME" and Sisters Travel and Transportation Services, LLC, a New York State limited liability corporation, hereinafter referred to as "PROVIDER", located at 2585 Broadway #240, New York, NY 10025.

### 1. **TERM**

This annual AGREEMENT shall be effective from July 2, 2024, through June 27, 2025, hereinafter referred to as "TERM", and cannot be terminated except as provided in Section 7.

The STUDENT attends a private school, the International Academy for the Brain ("iBRAIN"), located at 403 East 91st Street, New York, NY 10128 (iBRAIN-Manhattan), or at 213 48th Street, Brooklyn, NY 11220 (iBRAIN-Brooklyn) hereinafter referred to as "SCHOOL".

STUDENT attends SCHOOL year-round for approximately 223 days based on SCHOOL's, 12-month 2024-2025 School Year calendar, hereinafter referred to as "SCHOOL DAYS."

### 2. **PURPOSE OF THIS AGREEMENT**

The purpose of this AGREEMENT is to establish responsibilities between PROVIDER and CLIENT, hereinafter referred to as "PARTIES", related to the provision of special school transportation services, hereinafter referred to as "SERVICES", for STUDENT during the TERM from HOME to SCHOOL and SCHOOL to HOME during SCHOOL DAYS.

### 3. **SCHEDULE OF SERVICE**

The pick-up location each SCHOOL DAY morning will be HOME and the drop-off location will be SCHOOL, hereinafter referred to as "AM TRIP."

The pick-up location each SCHOOL DAY in the afternoon will be SCHOOL and the drop-off location will be HOME, hereinafter referred to as "PM TRIP."

The AM TRIP and PM TRIP will be no more than 90 minutes each way.

The timing of the AM TRIP and PM TRIP will be determined at least seven (7) days prior to the first day of SCHOOL DAYS. There will be a 15-minute grace period for STUDENT to be ready for AM TRIP and PM TRIP, hereinafter referred to as "FLEXIBLE PICK-UP / DROP-OFF TIMES."

In addition, the CLIENT has the right to change the AM TRIP or PM TRIP times or locations, within New York City, with 72 hours notification to PROVIDER, hereinafter referred to as "CHANGE TO TRIP." The CLIENT must receive written email confirmation from PROVIDER of the request of CHANGE TO TRIP to guarantee modification to the AM TRIP or PM TRIP.

*INCLEMENT WEATHER*
PROVIDER will follow the decisions of the SCHOOL, for all Inclement Weather school delays or cancellations. Transportation will be provided for delayed opening and early dismissals according to SCHOOL's weather-related changes. PROVIDER reserves the right to make a decision to adjust pickup times as necessary when it is determined to be in the best interest of STUDENT, this information will be communicated to each CLIENT via email and/or phone call.

### 4. **PROVIDER RESPONSIBILITES**

1

F - 1

PROVIDER shall provide the vehicles, drivers and dispatching necessary to provide the SERVICES in accordance with the terms of this AGREEMENT.

The PROVIDER agrees to use safe and clean equipment and properly trained and licensed drivers employed by or under contract with the PROVIDER.

The vehicle providing SERVICES for CLIENT shall meet any and all standards required by federal and state law. The vehicle will also maintain the following conditions: Air conditioning, regular-size wheelchair accessibility (e.g., lift-bus/wheelchair ramp), and sitting space to accommodate a person to travel with STUDENT, as needed. If STUDENT requires additional equipment for transportation (i.e., oxygen tanks), the vehicle will accommodate these additional needs of STUDENT

## 5.  INSURANCE

PROVIDER shall obtain and keep in force during the TERM of this AGREEMENT the following insurance coverages:

Workmen's Compensation Insurance in compliance with the laws of the State of New York covering all employees who perform for PROVIDER under this AGREEMENT.

Comprehensive Auto Liability Insurance on all vehicles used in connection with this AGREEMENT whether owned, non-owned, or hired; and

Comprehensive General Liability Insurance with limits for bodily injury or death.

## 6.  FEES and PAYMENT FOR SERVICES

The PARTIES agree all SERVICES will be billed at an annual rate of $191,111.00, hereinafter referred to as "FEES". CLIENT shall pay FEES with three payment installments: Payment 1: $31,851.25 due on July 2, 2024, Payment 2: $63,704.25 due on September 1, 2024, and a final payment, Payment 3 $95,555.50 due on January 1, 2025.

CLIENT understands and accepts FEES will be based on SCHOOL DAYS, whether STUDENT used SERVICES or not, unless PROVIDER was at fault for STUDENT not utilizing SERVICES. All of the FEES described above are considered "PROVIDED SERVICES". CLIENT warrants STUDENT will be enrolled in SCHOOL for the TERM and obligation to pay FEES is unconditional and cannot be apportioned or mitigated, except as explained above. PROVIDER will not take any deductions, omissions, or refunds for unexcused absences, withdrawal, suspension or for any other reason except as outlined in Section 7.

PROVIDER understands and accepts CLIENT will be seeking third party payments for SERVICES from the local school district (e.g., New York City Department of Education) ("THIRD PARTY") through either a Stipulation Agreement or through an impartial hearing process. PROVIDER agrees to suspend payment obligations until an interim or final administrative or judicial decision is made obligating THIRD PARTY to pay all or part of FEES and those payment obligations will become immediately due as per the terms of this AGREEMENT, and shall be paid within thirty (30) days of the interim or final decision or execution of a Stipulation Agreement. In the event an administrative or court decision is not in the CLIENT's favor for payment, payment will be suspended until the CLIENT has exhausted all legal remedies available to them to secure third party funding, when all payments will immediately become due.

Late Payment Penalty. Upon the failure to pay in full any payment obligation due based on the terms of this AGREEMENT ("Amount Outstanding") within seven (7) business days of the due date for such payment, a late payment penalty of ten percent (10.0%) of the Amount Outstanding (the "Late Payment Amount") shall immediately be added to the Amount Outstanding. The imposition of the Late Payment Amount shall be in addition to any other rights and remedies of PROVIDER under this AGREEMENT. Any balances of any

2

F - 2

amount which remains unpaid, i.e., Amount Outstanding, including any Late Payment Amount, more than thirty (30) days after it is due shall accrue interest until paid at the rate equal to the lesser of two percent (2.0%) per calendar month or the maximum amount allowed under Applicable Law. However, in no event shall this interest provision be construed as a grant of permission for payment delays.

## 7. TERMINATION

Termination for Cause. If PROVIDER or CLIENT fails to perform in the manner called for in this AGREEMENT, or if PROVIDER or CLIENT fails to comply with any other provisions of the AGREEMENT and fails to correct such noncompliance within five (5) business days written notice thereof, CLIENT or PROVIDER may terminate this AGREEMENT for cause.

Termination shall be effected by serving a written notice of termination on PROVIDER or CLIENT setting forth the manner in which PROVIDER or CLIENT is in default.

The CLIENT may terminate the AGREEMENT if STUDENT relocates outside of local school district or due to health reasons STUDENT is no longer requiring special school transportation services. Termination shall be effected by serving a written notice of termination on PROVIDER setting forth the conditions for termination.

In the event, CLIENT has exhausted all legal remedies available to them to secure third party funding, the CLIENT may terminate the AGREEMENT in writing, but will remain responsible for any balance due to PROVIDER on the date of such termination.

## 8. INDEPENDENT CONTRACTOR RELATIONSHIP

The PARTIES acknowledge and agree the SERVICES performed by the PROVIDER, its employees, agents or sub-contractors shall be as an independent contractor and nothing in this AGREEMENT shall be deemed to constitute a partnership, joint venture, agency relationship or otherwise between the PARTIES.

## 9. COMPLIANCE WITH LAWS

PROVIDER, in the performance of this AGREEMENT, shall comply with all applicable federal, state and local laws and ordinances, including regulations for licensing, certification and operation of facilities, programs, accreditation, and licensing of individuals, and any other standards or criteria as described in this AGREEMENT to assure quality of services.

## 10. NONDISCRIMINATION POLICY

PROVIDER is an equal opportunity employer.

Nondiscrimination in Employment. In the performance of this AGREEMENT, PROVIDER will not discriminate against any employee or applicant for employment on the grounds of race, creed, color, natural origin, sex, marital status, age or the presence of any sensory, mental or physical handicap; provided that the prohibition against discrimination in employment because of handicap shall not apply if the particular disability prevents the proper performance of the particular work involved. PROVIDER shall ensure that applicants are employed, and that employees are treated during their employment, without regard to their race, creed, color, natural origin, sex, marital status, age or the presence of any sensory, mental or physical handicap. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay, or other forms of compensation; and selection for training, including apprenticeships.

Nondiscrimination in Services. PROVIDER will not discriminate against any recipient of any services or benefits provided for in this AGREEMENT on the grounds of race, creed, color, natural origin, sex, marital

F - 3

Document ID: 28268cf6-c8b0-45b5-9bb5-315a0650d3b3

status, age or the presence of any sensory, mental or physical handicap.

If any assignment and/or subcontracting by PROVIDER, said assignment or subcontract shall include appropriate safeguards against discrimination. PROVIDER shall take such action as may be required to ensure full compliance with the provisions in the immediately preceding paragraphs herein.

## 11. ASSIGNMENT/SUBCONTRACTING

PROVIDER may assign or subcontract its performance under this AGREEMENT or any portion of this AGREEMENT and it will be binding upon and inure to the benefit of the successors and assigns of PROVIDER.

In the event THIRD PARTY, or another entity ("Obligor"), is obligated by administrative or court order to make payment(s) to PROVIDER on behalf of CLIENT ("Assignor") under the terms of this AGREEMENT and fails to make such payment(s) within thirty-five (35) days upon becoming due ("Outstanding Financial Obligation"), at the written request of PROVIDER, CLIENT shall assign and transfer to PROVIDER ("Assignee") the title and ownership to such claim and cause of action that exists in CLIENT's favor against any such entity and thereby authorize PROVIDER to prosecute said action to resolve said claim at PROVIDER's discretion. Assignor understands that whatever amounts Assignee does not collect from Obligor (whether it be all or part of what is due) shall be paid by Assignor as per the terms of the AGREEMENT.

## 12. CONSENT TO COLLATERAL ASSIGNMENT

CLIENT hereby consents to the collateral assignment by the PROVIDER of all of its right, title and interest in, to and under this AGREEMENT to a collateral agent pursuant to any security agreement the PROVIDER may enter into. The PARTIES agree the collateral agent (or its designee or assignee) shall be entitled to enforce this AGREEMENT in its own name and to exercise any and all rights of the PROVIDER under this AGREEMENT in accordance with the terms hereof (either in its own name or in the name of the PROVIDER, as the collateral agent may elect), and the PARTIES agree to comply and cooperate in all respects with such exercise. Without limiting the generality of the foregoing, the collateral agent (or its designee or assignee), shall have the full right and power to enforce directly against the CLIENT all obligations of the CLIENT under this AGREEMENT and otherwise to exercise all remedies available to the PROVIDER hereunder, and to make all demands and give all notices and make all requests (either in its own name or in the name of the PROVIDER, as the collateral agent may elect) required or permitted to be made or given by the PROVIDER under this AGREEMENT, and the CLIENT acknowledges and agrees that any such action taken by the collateral agent shall be deemed effective for all purposes of this AGREEMENT to the same extent as if such action had been taken directly by the PROVIDER. If the CLIENT shall receive inconsistent directions under this AGREEMENT from the PROVIDER and the collateral agent, the directions of the collateral agent shall be deemed the superseding directions (so long as such directions are consistent with the provisions of this AGREEMENT) and the CLIENT shall accordingly comply with such directions of the collateral agent.

## 13. MODIFICATIONS

Either party may request modifications/amendments to this AGREEMENT, however, no change or addition to this AGREEMENT shall be valid or binding upon either party unless such change or addition be in writing and signed by both PARTIES. Such amendments shall be attached to and made a part of this AGREEMENT.

## 14. NOTICE

By executing the AGREEMENT, the PARTIES agree to the terms set forth above and all notices required for in the AGREEMENT shall be sent by certified mail, return receipt or overnight delivery with signature to the addresses designated for the PARTIES on the first page of this AGREEMENT.

4

F - 4

15. **ATTORNEY'S FEES AND COSTS**

If any legal proceeding is brought for the enforcement of this AGREEMENT, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this AGREEMENT, the prevailing party shall be entitled to recover from the other party, in addition to any other relief to which such party may be entitled, reasonable attorney's fees and others costs incurred in such action or proceeding.

16. **JURISDICTION**

This AGREEMENT has been and shall be construed as having been made and delivered within New York State, and it is agreed by the PARTIES hereto this AGREEMENT shall be governed by, and construed and enforced in accordance with, the substantive laws of New York State, without regard to any conflicts of law provisions thereof that would result in the application of the laws of any other jurisdiction.  Any action of law, suit in equity, or judicial proceeding for the enforcement of this AGREEMENT or any provisions thereof, shall be instituted and maintained only in any of the courts of competent jurisdiction in New York County, New York State.

17. **SEVERABILITY**

It is understood and agreed by the parties hereto that if any part, term or provision of this AGREEMENT is held by the courts of the United States to be illegal, the validity of the remaining provisions shall not be affected, and the rights and obligations of the PARTIES shall be construed and enforced as if the AGREEMENT did not contain the particular provision held to be invalid.

If it should appear that any provision hereof is in conflict with any statutory provision of New York State, said provision which may conflict therewith shall be deemed inoperative and null and void insofar as they may be in conflict therewith, and shall be deemed modified to conform to such statutory provision.

18. **ENTIRE CONTRACT**

The PARTIES agree this AGREEMENT is the complete expression of the terms hereto and any oral representations or understandings not incorporated herein are excluded.  Further, any modification of this AGREEMENT shall be in writing and signed by both PARTIES.  Failure to comply with any of the provisions stated herein shall constitute material breach of contract and cause for termination.  It is also agreed by the PARTIES the forgiveness of the nonperformance of any provision of this AGREEMENT does not constitute a waiver of the provisions of this AGREEMENT.

19. **EXECUTION OF AGREEMENT**

The AGREEMENT may be executed in counterpart with facsimile copies of signatures that shall serve as acceptable substitutes for original signatures and shall be legally binding.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK]

F - 5

Document ID: 28268cf6-c8b0-45b5-9bb5-315a0650d3b3

IN WITNESS WHEREOF, the parties hereto have caused this AGREEMENT to be executed.

**CLIENT:**

_____
DATE

████████ ████████
STUDENT NAME

<u>MAYLENE OTERO</u>
CLIENT NAME

*Maylene Otero*
_____
CLIENT SIGNATURE

**PROVIDER:**

*Peter Lam*
_____
Account Manager/Authorized Signature

<u>Peter Lam</u>
Account Manager/Authorized Signatory Name
Sisters Travel and Transportation Services, LLC
2585 Broadway #240, New York, NY 10025

F - 6



Completed Document Audit Report
Completed with SignWell.com

## Title: ██████ RIVERA 24-25 AGREEMENT

Document ID: 28268cf6-c8b0-45b5-9bb5-315a0650d3b3

Time Zone: (GMT+00:00) Coordinated Universal Time

---

**Files**

██████ RIVERA 24-25 AGREEMENT.docx                    Jun 17, 2024 16:49:06 UTC

**Activity**

| | Sisters Travel and Transportation Services | created the document | Jun 17, 2024 16:49:22 UTC |
|---|---|---|---|
| | IP: 158.222.168.132 | | |
| | Sisters Travel and Transportation Services | sent the document to sisterstravellc@gmail.com and omaylene@gmail.com | Jun 17, 2024 17:04:23 UTC |
| | IP: 158.222.168.132 | | |
| | Maylene Otero | first viewed document | Jun 20, 2024 14:12:16 UTC |
| | IP: 165.155.129.115 | | |
| | Maylene Otero | signed the document | Jun 20, 2024 14:12:28 UTC |
| | IP: 165.155.129.115 | | |
| | Sisters Travel and Transportation Services | first viewed document | Jun 20, 2024 14:35:57 UTC |
| | IP: 184.153.75.82 | | |
| | Sisters Travel and Transportation Services | signed the document | Jun 20, 2024 14:36:28 UTC |
| | IP: 184.153.75.82 | | |

F - 7

**NURSING SERVICE AGREEMENT**

This agreement, hereinafter referred to as "AGREEMENT", is made and entered into by and between Maylene Otero, hereinafter referred to as "CLIENT", Parent of ▬▬▬▬ Rivera, hereinafter referred to as "STUDENT" residing at 3620 Webster Avenue Bronx, NY 10467,hereinafter referred to as "HOME" and B&H Health Care Services, Inc. - DBA Park Avenue Home Care, a New York State limited liability corporation, hereinafter referred to as "PROVIDER", located at 175 South 9th Street, Brooklyn, NY 11211.

**1.TERM**
This annual AGREEMENT shall be effective from July 2, 2024, through June 27, 2025, hereinafter referred to as "TERM", and cannot be terminated except as provided in SECTION 7.

The STUDENT attends a private school, the International Academy for the Brain ("iBRAIN", "SCHOOL"), located at 403 East 91st Street, New York, NY 10128 (iBRAIN-Manhattan), or at 213 48th Street, Brooklyn, NY 11220 (iBRAIN-Brooklyn) hereinafter referred to as "SCHOOL".

STUDENT attends SCHOOL year-round for approximately 223 days based on the SCHOOL 12-month 2024-2025 School Year calendar, hereinafter referred to as "SCHOOL DAYS." The hours of operation for the STUDENT at the SCHOOL are typically 8:30AM to 4:30PM, with
slight variations depending on the unique needs of the STUDENT, hereinafter referred to as "SCHOOL HOURS."

**2. PURPOSE OF THIS AGREEMENT**
The purpose of this AGREEMENT is to establish responsibilities between PROVIDER and CLIENT, hereinafter referred to as "PARTIES", related to the provision of 1:1 Private Duty Nursing services during the school day and/or a 1:1 Transportation Nurse, hereinafter referred to as "SERVICES", for STUDENT during the TERM during SCHOOL DAYS as outlined in section 3 below.

**3. SCHEDULE OF SERVICE**
TRANSPORTATION NURSE SCHEDULE
PROVIDER shall provide a 1:1 Transportation Nurse for STUDENT
- The pick-up location each SCHOOL DAY morning will be HOME and the drop-off location will be SCHOOL, hereinafter referred to as "AM TRIP."
- The pick-up location each SCHOOL DAY in the afternoon will be SCHOOL and the drop-off location will be HOME, hereinafter referred to as "PM TRIP."
- The AM TRIP and PM TRIP will be no more than 90 minutes each way.
- There will be a 15-minute grace period for STUDENT to be ready for AM TRIP and PM TRIP, hereinafter referred to as "FLEXIBLE PICK-UP / DROP-OFF TIMES."
- In addition, the CLIENT has the right to change the AM TRIP or PM TRIP times

or locations, within New York City, with 72 hours notification to PROVIDER, hereinafter referred to as "CHANGE TO TRIP." The CLIENT must receive written email confirmation from PROVIDER of the request of CHANGE TO TRIP to guarantee modification to the AM TRIP or PM TRIP.

SCHOOL NURSE
- PROVIDER shall provide a 1:1 Private Duty Nurse for STUDENT during the SCHOOL HOURS.

INCLEMENT WEATHER
- PROVIDER will follow the decisions of the SCHOOL, for all Inclement Weather school delays or cancellations.  SERVICES will be provided for delayed opening and early dismissals according to SCHOOL's weather-related changes.  PROVIDER reserves the right to make a decision to adjust pickup times as necessary when it is determined to be in the best interest of STUDENT, this information will be communicated to each CLIENT via email and/or phone call.

**4. PROVIDER RESPONSIBILITES**
PROVIDER shall provide the SERVICES in accordance with the terms of this AGREEMENT. The PROVIDER agrees to use properly trained and licensed nurses employed by or under contract with the PROVIDER.

PROVIDER is not responsible for providing additional medical or health equipment needed for STUDENT, such as, but not limited to, food, medicines, oxygen equipment, gastrostomy tube equipment, or tracheostomy tube equipment.

**5. INSURANCE**
PROVIDER shall obtain and keep in force during the TERM of this AGREEMENT proper insurance coverages for the SERVICES performed, including, but not limited to:
- Workmen's Compensation Insurance in compliance with the laws of the State of New York covering all employees who perform for PROVIDER under this AGREEMENT; and
- General Liability Insurance for all SERVICES in connection with this AGREEMENT.

**6. FEES and PAYMENT FOR SERVICES**
The PARTIES agree all SERVICES will be billed at an annual rate of $333,608, hereinafter referred to as "FEES". CLIENT shall pay FEES with three payment installments: Payment 1: $56,848.00 due on July 2, 2024, Payment 2: $106,216.00 due on September 5, 2024, and a final payment, Payment 3: $170,544.00 due on January 2, 2025.

CLIENT understands and accepts FEES will be based on SCHOOL DAYS, whether STUDENT used SERVICES or not, unless PROVIDER was at fault for STUDENT not utilizing SERVICES. CLIENT warrants STUDENT will be enrolled in SCHOOL for the TERM and obligation to pay FEES is unconditional and cannot be apportioned or mitigated, except as explained above. PROVIDER will not take any deductions, omissions, or refunds for unexcused

G - 2

absences, withdrawal, suspension or for any other reason except as outlined in Section 7. PROVIDER understands and accepts CLIENT will be seeking third party payments for SERVICES from the local school district (e.g., New York City Department of Education) through either an agreement or through an impartial hearing process. PROVIDER agrees to suspend payment obligations until either an agreement or a final administrative or judicial decision is made and then payment will become immediately due within thirty (30) days of the final adjudication or execution of an agreement with the local school district.

In the event Parent is denied all or part of the funding due under this Agreement by a final administrative or judicial decision, including all state and federal appeals resolving the claim for such funding, Parent will be permitted to immediately terminate this contract per Section 7 below. Upon termination, Parent will be required to execute a payment schedule to comply with the contractual obligations based upon the financial need of Parent for any balances due to PROVIDER on the date of withdrawal.

## 7. __TERMINATION__
Termination for Cause. If PROVIDER or CLIENT fails to perform in the manner called for in this AGREEMENT, or if PROVIDER or CLIENT fails to comply with any other provisions of the AGREEMENT and fails to correct such noncompliance within five (5) business days written notice thereof, CLIENT or PROVIDER may terminate this AGREEMENT for cause.

Termination shall be affected by serving a notice of termination on PROVIDER or CLIENT setting forth the manner in which PROVIDER or CLIENT is in default.

The CLIENT may terminate the AGREEMENT if STUDENT relocates outside of local school district or due to health reasons STUDENT is no longer requiring SERVICES.

In the event, CLIENT has exhausted all legal remedies available to them to secure third party funding, the CLIENT may terminate the AGREEMENT in writing, but will remain responsible for any balance due to PROVIDER on the date of such termination

## 8. __INDEPENDENT CONTRACTOR RELATIONSHIP__
The PARTIES acknowledge and agree the SERVICES performed by the PROVIDER, its employees, agents or sub-contractors shall be as an independent contractor and nothing in this AGREEMENT shall be deemed to constitute a partnership, joint venture, agency relationship or otherwise between the PARTIES.

## 9. __COMPLIANCE WITH LAWS__
PROVIDER, in the performance of this AGREEMENT, shall comply with all applicable federal, state and local laws and ordinances, including regulations for licensing, certification and operation of facilities, programs, accreditation, and licensing of individuals, and any other standards or criteria as described in this AGREEMENT to assure quality of services.

## 10. __NONDISCRIMINATION POLICY__
PROVIDER is an equal opportunity employer.

Nondiscrimination in Employment. In the performance of this AGREEMENT, PROVIDER will not discriminate against any employee or applicant for employment on the grounds of race, creed, color, natural origin, sex, marital status, age or the presence of any sensory, mental or physical handicap; provided that the prohibition against discrimination in employment because of handicap shall not apply if the particular disability prevents the proper performance of the particular work involved. PROVIDER shall ensure that applicants are employed, and that employees are treated during their employment, without regard to their race, creed, color, natural origin, sex, marital status, age or the presence of any sensory, mental or physical handicap. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay, or other forms of compensation; and selection for training, including apprenticeships.

Nondiscrimination in Services. PROVIDER will not discriminate against any recipient of any services or benefits provided for in this AGREEMENT on the grounds of race, creed, color, natural origin, sex, marital status, age or the presence of any sensory, mental or physical handicap.

If any assignment and/or subcontracting by PROVIDER, said assignment or subcontract shall include appropriate safeguards against discrimination. PROVIDER shall take such action as may be required to ensure full compliance with the provisions in the immediately preceding paragraphs herein.

## 11. ASSIGNMENT/SUBCONTRACTING

PROVIDER may assign or subcontract its performance under this AGREEMENT or any portion of this AGREEMENT and it will be binding upon and insure to the benefit of the successors and assigns of PROVIDER.

## 12. CONSENT TO COLLATERAL ASSIGNMENT

CLIENT hereby consents to the collateral assignment by the PROVIDER of all of its right, title and interest in, to and under this AGREEMENT to a collateral agent pursuant to any security agreement the PROVIDER may enter into. The PARTIES agree the collateral agent (or its designee or assignee) shall be entitled to enforce this AGREEMENT in its own name and to exercise any and all rights of the PROVIDER under this AGREEMENT in accordance with the terms hereof (either in its own name or in the name of the PROVIDER, as the collateral agent may elect), and the PARTIES agree to comply and cooperate in all respects with such exercise. Without limiting the generality of the foregoing, the collateral agent (or its designee or assignee), shall have the full right and power to enforce directly against the CLIENT all obligations of the CLIENT under this AGREEMENT and otherwise to exercise all remedies available to the PROVIDER hereunder, and to make all demands and give all notices and make all requests (either in its own name or in the name of the PROVIDER, as the collateral agent may elect) required or permitted to be made or given by the PROVIDER under this AGREEMENT, and the CLIENT acknowledges and agrees that any such action taken by the collateral agent shall be deemed effective for all purposes of this AGREEMENT to the same extent as if such action had been taken directly by the PROVIDER. If the CLIENT shall receive inconsistent directions under this AGREEMENT from the PROVIDER and the collateral agent, the directions of the collateral agent shall be deemed the superseding directions (so long as such

directions are consistent with the provisions of this AGREEMENT) and the CLIENT shall accordingly comply with such directions of the collateral agent.

## 13. MODIFICATIONS

Either party may request modifications/amendments to this AGREEMENT, however, no change or addition to this AGREEMENT shall be valid or binding upon either party unless such change or addition be in writing and signed by both PARTIES. Such amendments shall be attached to and made a part of this AGREEMENT.

## 14. NOTICE

By executing the AGREEMENT, the PARTIES agree to the terms set forth above and all notices required for in the AGREEMENT shall be sent by certified mail, return receipt or overnight delivery with signature to the addresses designated for the PARTIES on the first page of this AGREEMENT.

## 15. ATTORNEY'S FEES AND COSTS

If any legal proceeding is brought for the enforcement of this AGREEMENT, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this AGREEMENT, the prevailing party shall be entitled to recover from the other party, in addition to any other relief to which such party may be entitled, reasonable attorney's fees and others costs incurred in such action or proceeding.

## 16. JURISDICTION

This AGREEMENT has been and shall be construed as having been made and delivered within New York State, and it is agreed by the PARTIES hereto this AGREEMENT shall be governed by, and construed and enforced in accordance with, the substantive laws of New York State, without regard to any conflicts of law provisions thereof that would result in the application of the laws of any other jurisdiction. Any action of law, suit in equity, or judicial proceeding for the enforcement of this AGREEMENT or any provisions thereof, shall be instituted and maintained only in any of the courts of competent jurisdiction in New York County, New York State.

## 17. SEVERABILITY

It is understood and agreed by the parties hereto that if any part, term or provision of this AGREEMENT is held by the courts of the United States to be illegal, the validity of the remaining provisions shall not be affected, and the rights and obligations of the PARTIES shall be construed and enforced as if the AGREEMENT did not contain the particular provision held to be invalid.

If it should appear that any provision hereof is in conflict with any statutory provision of New York State, said provision which may conflict therewith shall be deemed inoperative and null and void insofar as they may be in conflict therewith, and shall be deemed modified to conform to such statutory provision.

## 18. ENTIRE CONTRACT

The PARTIES agree this AGREEMENT is the complete expression of the terms hereto and any oral representations or understandings not incorporated herein are excluded. Further, any

**G - 5**

modification of this AGREEMENT shall be in writing and signed by both PARTIES. Failure to comply with any of the provisions stated herein shall constitute material breach of contract and cause for termination. It is also agreed by the PARTIES the forgiveness of the nonperformance of any provision of this AGREEMENT does not constitute a waiver of the provisions of this AGREEMENT.

## 19. EXECUTION OF AGREEMENT

The AGREEMENT may be executed in two or more counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same instrument. The words "execution," "signed," "signature," and words of like import in this AGREEMENT or in any other certificate, agreement or document related to this AGREEMENT, shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and AdobeSign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK]

G - 6

IN WITNESS WHEREOF, the parties hereto have caused this AGREEMENT to be executed.

**STUDENT:** ███ **Rivera**

**CLIENT: Maylene Otero**

*Maylene Otero*
_____
CLIENT SIGNATURE

**PROVIDER**:

_____
Account Manager/Authorized Signature
266 Broadway #302, Brooklyn, NY 11211

**DATE:** 6/18/24
_____
(or via Electronic Date Stamp)

G - 7



## Completed Document Audit Report

Completed with SignWell.com

### Title: Annual Nursing Contract for 2024-2025 School Year ████ Rivera

Document ID: 309937bc-960c-4dd0-a57b-1649c0a1970e

Time Zone: (GMT+00:00) Coordinated Universal Time

---

## Files

Annual Nursing Contract for 2024-2025 School Year .pdf | Jun 18, 2024 16:09:48 UTC

## Activity

| | | |
|---|---|---|
| **Susan Friedman** IP: 98.116.5.178 | created the document | Jun 18, 2024 16:10:15 UTC |
| **Susan Friedman** IP: 98.116.5.178 | sent the document to omaylene@gmail.com and cj@nursingpersonnel.com | Jun 18, 2024 16:10:33 UTC |
| **[Email ID]** IP: 98.116.5.178 | **cj@nursingpersonnel.com -** first viewed document | Jun 18, 2024 16:14:45 UTC |
| **[Email ID]** IP: 98.116.5.178 | **cj@nursingpersonnel.com -** signed the document | Jun 18, 2024 16:15:14 UTC |
| **[Email ID]** IP: 165.155.129.115 | **omaylene@gmail.com -** first viewed document | Jun 20, 2024 14:10:59 UTC |
| **[Email ID]** IP: 165.155.129.115 | **omaylene@gmail.com -** signed the document | Jun 20, 2024 14:11:25 UTC |

G - 8