# EXHIBIT B

O15WgruC

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     JANERIS DE JESUS RODRIGUEZ, as
3    Parent and Natural Guardian of
     E.R., et al.,
4
                    Plaintiffs,
5
              v.                         23 Civ. 10356 (KPF)
6
     DAVID C. BANKS, et al.,
7
                    Defendants.
8    ------------------------------x
     MADELINE GRULLON, as Parent and
9    Natural Guardian of C.B., et al.,

10                  Plaintiffs,

11            v.                         23 Civ. 10388 (KPF)

12   DAVID C. BANKS, et al.,

13                  Defendants.
                                         Conference
14   ------------------------------x
                                         New York, N.Y.
15                                       January 5, 2024
                                         10:30 a.m.
16
     Before:
17               HON. KATHERINE POLK FAILLA,

18                                       District Judge

19                          APPEARANCES

20   RORY J. BELLANTONI
     BRADLEY CLICK
21       Attorneys for Plaintiffs

22   HON. SYLVIA O. HINDS-RADIX
         Corporation Counsel of the City of New York
23       New York City Law Department
         Attorney for Defendant City of New York
24   BY:  JAIMINI A. VYAS
         ALFRED MILLER, Jr.
25       THOMAS LINDEMAN
         Assistants Corporation Counsel
```

O15WgruC

1            (Case called)

2            THE COURT:  Good morning, everyone.

3            MR. BELLANTONI:  Good morning, your Honor.  Rory

4    Bellantoni for the plaintiffs.

5            THE COURT:  Good morning.

6            MR. BELLANTONI:  I have with me Bradley Click, works

7    in our office.  He's admitted in Virginia, not in New York yet.

8    He's awaiting admission.

9            THE COURT:  OK.

10           MR. BELLANTONI:  But I'd ask that he be allowed to sit

11   with me to help me today.

12           THE COURT:  He, of course, can sit to help you today,

13   but does he want to speak at all?

14           MR. BELLANTONI:  Well, let me address that.  I didn't

15   realize until today, after 30 years, that he could be admitted

16   *pro hac* in the state, to be in the state.  Somebody had

17   suggested that.

18           THE COURT:  Oh, I'm thinking of something a little bit

19   different, which is, and this just because I'm a federal judge

20   and I can do lots of things.  I'm giving him *pro hac* **to speak**

21   today.

22           MR. BELLANTONI:  OK.

23           THE COURT:  And if he's going to speak further in the

24   case or do anything else, he can file a formal *pro hac vice*

25   motion.  This is sort of like a trial offer.  He gets today to

O15WgruC

```
1   speak.
2               Welcome, sir.  Thank you both very much.
3               And my friends at the back table.  Go ahead, please.
4               MR. VYAS:  Good morning, your Honor.  I'm Jaimini
5   Vyas.
6               MR. MILLER:  Arthur Miller Jr. on behalf of the city
7   New York.
8               MR. LINDEMAN:  Thomas Lindeman, for defendants, your
9   Honor.
10              THE COURT:  Tell me, please, gentlemen, among the
11  three of you, who is going to be taking the lead, or are you
12  trading depending on my questions?
13              Mr. Vyas, should I be speaking to you first, sir?
14              MR. VYAS:  Your Honor, that is fine.
15              THE COURT:  Thank you so much.
16              OK.  Mr. Miller is also offering you up, so I
17  appreciate that.
18              I have reviewed a lot of papers in connection with
19  this proceeding, including all of the reply submissions.
20              Mr. Bellantoni, or maybe I'm directing this to
21  Mr. Click, when you called my chambers at 9 o'clock yesterday
22  and said you needed two more hours to ensure that you would
23  have a better submission -- first of all, you're threatening me
24  with a bad submission, which I don't care for.  But please, I
25  said, and I told my clerk to say to you, and I heard my clerk
```

O15WgruC

1    say to you, not one minute more.

2            Did you not hear my clerk say that to you, sir?  Who

3    made the call?

4            MR. BELLANTONI:  Your Honor, he made the call, but I

5    can address that, because he did relay the messages to me.

6            THE COURT:  OK.

7            MR. BELLANTONI:  And I can tell you why it was late.

8            THE COURT:  No.  There was no reason for it to be

9    late.  It was filed at 2:41 p.m.  I was there.  I was there at

10   two.  I was there a minute after two.  I was there at two

11   minutes after two.  I was there checking on a periodic basis as

12   to where this was.  I'm not sure what possessed you to think

13   that you could file it at 2:41 p.m.  If you're going to tell me

14   it took you 41 minutes to actually work the Court's ECF system,

15   I'll listen to you, but I'd be surprised.

16           Why was it late, sir, and why did you not listen to my

17   very clear directive?

18           MR. BELLANTONI:  Your Honor, if I may?

19           It actually starts on Tuesday, and I apologize, but

20   the firm -- right now we lost three lawyers in the past month.

21   I'm the only one actually working actively on these cases, who

22   can file things.  I'm the only one admitted in federal court.

23   I had a comprehensive letter due Tuesday, a reply due Tuesday

24   and this due by noon.  I started Tuesday morning and worked

25   from 8 o'clock Tuesday morning through the night into Wednesday

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O15WgruC

1    say to you, not one minute more.

2            Did you not hear my clerk say that to you, sir?  Who

3    made the call?

4            MR. BELLANTONI:  Your Honor, he made the call, but I

5    can address that, because he did relay the messages to me.

6            THE COURT:  OK.

7            MR. BELLANTONI:  And I can tell you why it was late.

8            THE COURT:  No.  There was no reason for it to be

9    late.  It was filed at 2:41 p.m.  I was there.  I was there at

10   two.  I was there a minute after two.  I was there at two

11   minutes after two.  I was there checking on a periodic basis as

12   to where this was.  I'm not sure what possessed you to think

13   that you could file it at 2:41 p.m.  If you're going to tell me

14   it took you 41 minutes to actually work the Court's ECF system,

15   I'll listen to you, but I'd be surprised.

16           Why was it late, sir, and why did you not listen to my

17   very clear directive?

18           MR. BELLANTONI:  Your Honor, if I may?

19           It actually starts on Tuesday, and I apologize, but

20   the firm -- right now we lost three lawyers in the past month.

21   I'm the only one actually working actively on these cases, who

22   can file things.  I'm the only one admitted in federal court.

23   I had a comprehensive letter due Tuesday, a reply due Tuesday

24   and this due by noon.  I started Tuesday morning and worked

25   from 8 o'clock Tuesday morning through the night into Wednesday

O15WgruC

1    morning.  So by the time I filed this, it was 30 hours

2    straight.

3            When Mr. Click called and asked for additional time, I

4    was working on this reply.  As it approached 2 o'clock, it was

5    way longer than the ten pages it was supposed to be.  I didn't

6    have my table of authorities prepared yet because I hadn't

7    finalized the brief.  The bottom line, your Honor, is as I

8    approached 2 o'clock, I started at 1 o'clock to try to put

9    together the cover page, the table of contents, to get rid of

10   the three or four pages that I was over the limit amount, and

11   by the time I actually did that, it was 2:40.  2:48, I believe,

12   is exactly when I filed it.  I contemplated calling again at 2

13   o'clock.

14           THE COURT:  Yes.

15           MR. BELLANTONI:  Or 1:30.

16           THE COURT:  And if you had done so, I would have told

17   you no.  I would have told you I was not receiving it.  So

18   instead you are here asking for forgiveness rather than

19   permission.  That is also an unwise tack to take to me.

20           MR. BELLANTONI:  And I accept, your Honor, if it's not

21   going to be considered or stricken or whatever --

22           THE COURT:  I've considered it, but I don't appreciate

23   the disregard of the Court's orders.  That's what I'm saying.

24   You knew at 2 o'clock you weren't ready.  You had the sense or

25   the temerity to call at 9 a.m.  I don't know why you didn't

O15WgruC

1    call at 2 o'clock, because I personally sat there refreshing

2    ECF, waiting for this document.  I shouldn't have to do that,

3    sir.

4              MR. BELLANTONI:  I apologize.  And I understand that.

5    I had a sense you would not -- I guess the call would have been

6    just to apologize.  I know not one minute more would have been

7    no if I had asked for more time.

8              THE COURT:  That's correct.

9              MR. BELLANTONI:  I didn't know whether I should -- as

10   it was, it was a half a page over your rules.  I didn't know if

11   I should submit it with 50 pages.  Literally, physically, your

12   Honor, could not have gotten it done and didn't know what I

13   should submit at 2 o'clock if it wasn't complete.  So I do

14   apologize for that, your Honor.  And yes, I should have known

15   better.  After all my years of practice, I should have at least

16   called and let chambers know despite the order -- I wasn't

17   thumbing my nose at the court -- that I wouldn't be able to

18   finish it and it was going to be late.  But I apologize for not

19   doing that.

20             THE COURT:  Let me ask you a different question, sir.

21             What now remains?  You're here for preliminary

22   injunctive relief; yes, sir?  What is it that you're asking me

23   to do right now?  Because based on my read of the city's, DOE's

24   submissions, everyone seems to be up to date on tuition.  There

25   are some issues regarding transportation.  But are we, right

O15WgruC

1   now, today, having a preliminary injunction hearing, and if we

2   are, what is the injunctive relief that you seek now?

3          MR. BELLANTONI:  Your Honor, there is, based on what

4   I've been told and based on my -- last night, tuition due for,

5   I believe, and it's -- hold on.  I'm sorry.  For M.C., in the

6   amount of $94,000.

7          Y.N. is a separate issue, and we can discuss that a

8   little bit later.  But, your Honor, I could do that now.  With

9   respect to Y.N., there are three siblings in that family.

10         THE COURT:  Yes.

11         MR. BELLANTONI:  They left the school at various

12  times.  Y.N. was at the school through close to the end of this

13  year, so anything for the new year in terms of pendency

14  shouldn't be paid.  I'm just letting the DOE know that now.

15  The FOFD that comes out, the final order, I'm not involved in

16  that, but as far as what I'm asking for now, for Y.N., I

17  believe that child left the school mid-November, perhaps.  One

18  was earlier, one was later, but there is tuition outstanding

19  for July, August, September, October.  Transportation part of

20  that is outstanding as well, and nursing, not those entire

21  amounts, but there would be amounts outstanding for Y.N.

22         THE COURT:  But sir, under the *Mendez* theory, which is

23  what you're asking me to use, *Mendez* requires a showing that

24  the child is going to lose his placement.  If the child has

25  left the school, there's no chance of *Mendez* being satisfied,

O15WgruC

1   so on what basis are you seeking preliminary injunctive relief

2   for arrearages attributable to Y.N.'s placement?

3          MR. BELLANTONI:  Your Honor, as part of this motion, I

4   am not --

5          THE COURT:  Oh.

6          MR. BELLANTONI:  -- because the child is there.  But I

7   think I was answering two questions inartfully.  You asked if

8   there was any remaining tuition.

9          THE COURT:  No, no, no, no, no.  Let me ask a specific

10  question.  You have brought us here today to have a preliminary

11  injunction hearing.  You want preliminary injunctive relief in

12  one or both of these two cases for one or both of these

13  students involved in these cases.  Right now, today, as you're

14  sitting before me, what is it that you're asking me to order

15  today?

16         MR. BELLANTONI:  Under *Mendez*, there would not be the

17  urgency that's required with respect to the tuition.  So I'm

18  not asking for any of the tuition right now.  The

19  transportation amounts, however, the students who have pendency

20  and have transportation, which has not been paid, in Grullon,

21  for C.B., L.S., S.J.D.

22         THE COURT:  No, no.  Slow down for court reporter and

23  judge.  Tell me again.

24         MR. BELLANTONI:  OK.  I'm sorry.

25         C.B., there's $16,000 outstanding for transportation.

O15WgruC

1    L.S. it's 96,000.  S.J.D. it's 55,000.

2              THE COURT:  Wait, wait, wait.  S.J.D., who you're

3    going to tell me now has a pendency order from November of this

4    past year -- correct, sir -- and were you ever going to tell me

5    that S.J.D. is the son of the founder of iBRAIN?

6              MR. BELLANTONI:  The answer is yes.  It was in the

7    pleadings, but it's the daughter, actually.

8              (Indiscernible overlap)

9              THE COURT:  OK.  There's no world in which S.J.D. was

10   losing her placement at iBRAIN.  There's no world, so why is

11   there a TRO and a preliminary injunction for a student who is

12   the daughter of the founder of the school?

13             MR. BELLANTONI:  As far as the transportation is

14   concerned?  The transportation company still provides

15   transportation.  She's in a wheelchair.  Parent can't do that

16   in his car.  She still receives that service.

17             THE COURT:  But your motion, your complaint was not

18   merely for transportation, sir.

19             MR. BELLANTONI:  Yes.

20             THE COURT:  Yes?

21             MR. BELLANTONI:  And we discussed this on the phone,

22   your Honor, and this is one of the issues here.  I never

23   represented that this student got a direct letter that said

24   you'd be disenrolled because you haven't paid.

25             THE COURT:  Yes, sir.  I do remember our prior

O15WgruC

```
1   discussions.  I don't want you to talk to me as if I didn't.

2   But go ahead, please.

3           MR. BELLANTONI:  The larger question you had was about

4   the institution and its finances and if the institution could

5   not stay open any longer because he couldn't pay his employees,

6   then yes, S.J.D. would lose her placement.  It's not the

7   situation where the father would throw her out for nonpayment.

8   We originally discussed, or my motion brought with it the

9   information that the city hadn't paid for close to 30 students

10  a pendency.  There was $4 million outstanding, and as we

11  discussed, I had mentioned that a lot of that came in and you

12  had questions about the institution and its inability to

13  provide services versus the students' inability to get those

14  services and raised the issue of the institution, although it

15  wasn't a fact, and you had asked if they mismanaged their funds

16  would I have been asking for payment.

17          THE COURT:  Yes.

18          MR. BELLANTONI:  And the answer is not if there's no

19  FOFD or SRO decision or pendency order requiring payment that

20  was otherwise due.  Certainly could not, would not, entertain

21  asking the city to pay more money because the school is

22  threatened.  The problem I had is these students

23  collectively -- it's a procedural problem with bringing them

24  all in one cases because some judges have expressed that that

25  is not proper; they'd be improperly joined.
```

O15WgruC

1          THE COURT:  That's correct.

2          MR. BELLANTONI:  So for me to get 30 students before

3    the Court or 60 and advise the Court that if pendency isn't

4    paid for the 60 the school is going to close -- unless it

5    was -- couldn't be a class action; it's too small a class.  I

6    can't join them because some judges sever them.  Not all.

7    We've had many more cases brought with multiple plaintiffs that

8    remained joined than severed, so -- and again, I struggle with

9    this question.  Last time -- I struggle with it today because

10   they have, DOE has paid pendency for other students, which has

11   put the school in a position where they're now making payroll.

12   They have not missed a payment to their employees since

13   November 15, and the immediacy of the school closing does not

14   exist today the way it did when I started this action.

15         THE COURT:  And yet here you are, persisting with a PI

16   motion.  That's my point.  You're here.  We're here.  You're

17   asking for a PI motion, except you're limiting it now to

18   transportation costs.

19         MR. BELLANTONI:  Yes, your Honor.

20         THE COURT:  And you want me to accept the submissions

21   that have been made by Sisters transportation regarding the

22   arrearages and the possibility that they're not going to

23   transport these students; yes?  Do you have for each of the

24   students in each of the cases a letter from Sisters saying

25   there is an arrearage, it hasn't been paid, and we are not

O15WgruC

1    going to transport the student anymore?

2              MR. BELLANTONI:  No, your Honor.

3              THE COURT:  OK.  Then what is the basis, because I'm

4    not even sure that *Mendez* extends to cover transportation and

5    nursing costs.  Assuming it does, I do need some sort of

6    evidentiary showing as to why it is this student is going to

7    lose his or her placement as a consequence of the bus company

8    not picking this child up or the nursing services not being

9    provided.  Where is that evidence in your submission?

10              MR. BELLANTONI:  I'd have to go back and look at the

11   complaint.  I believe some of the students got letters, but as

12   far as your question, there is not one declaration, like the

13   Miller declaration, that establishes that.

14              THE COURT:  OK.  And you also know from a prior

15   communication that we've had that defendants have pointed out

16   that some of those notices have different names on them and

17   look as though they've been cut and pasted.  So I'm not sure

18   how much weight to give to a notice from Sisters transportation

19   or a notice from B&H nursing services that references the wrong

20   student.  That's my point.

21              But here we are, so you're going to be making an

22   argument to me that I, today, should be imposing preliminary

23   injunctive relief in the form of ordering DOE to pay

24   immediately the arrearages respecting students such as C.B.,

25   L.S. and S.J.D., correct?

O15WgruC

| 1 | MR. BELLANTONI:  Yes, with the qualification. |
|---|---|

THE COURT:  OK.  Give me your qualification.

MR. BELLANTONI:  Well, this has been another
contention in the case that I'm asking you to say tomorrow they
have to pay.  What I'm asking you to do is to say tomorrow,
next week, whatever number of days, because this is emergent in
the sense that we have students who are entitled to funding for
transportation.  If it's not being paid, I think at some point,
without a declaration, without an affidavit -- obviously, you
can't take judicial notice, but if they're not funding
transportation, there reaches a point in time where it's no
longer going to be available because they're not paying for it.

Now we're not making that argument right now.  That's
part of the larger case.

THE COURT:  OK, but what you're saying, *Mendez* says
you can't front-load, you can't force it to be paid in advance,
and the panel in *Mendez* said, to your firm -- to your firm --
that what that meant was that if there was a situation in which
the student was going to lose his or her placement, that you
might be able to get the automatic injunction to which you are
otherwise not entitled.

But now, today you're before me, and you're saying:
Look, Failla, it is not the tuition, because that's paid.
Instead, it is the transportation even though I have not
documented it for you.  Even if I've told you the arrearages, I

O15WgruC

1    don't have a letter for you from the transportation entity.

2    You should just figure out that someday the bus company is not

3    going to pick this kid up.

4           What I'm saying to you, sir, is I think your

5    evidentiary showing is insufficient to merit relief, and I

6    worry what you're trying to do is to have an unduly expansive

7    version of *Mendez*.  First of all, accepting that maybe

8    transportation and nursing are included within pendency, you

9    nonetheless want me to find that a mere delay, that I have to

10   make a decision that in three months, in six months, whatever

11   the delay is, that warrants immediate payment.  That's what

12   causes me concern.  Right now, today, you do not have, or at

13   least I don't think I'm going to find, a situation where

14   there's a student who is going to be left at home, unable to be

15   transported.  You can't say that to me today, can you?

16          MR. BELLANTONI:  I cannot, your Honor.

17          THE COURT:  OK.

18          MR. BELLANTONI:  The only way I could do that is if

19   you directed the folks from the other companies to come in here

20   and answer the question.

21          THE COURT:  Nothing stopped you from are bringing them

22   in today, sir.

23          MR. BELLANTONI:  I tried that in another -- I know

24   you're not the other judge.

25              (Indiscernible overlap)

O15WgruC

1          THE COURT:  You've got many cases before many judges,

2     sir, yes.

3          MR. BELLANTONI:  I did that in another case, and the

4     judge wouldn't allow the witness to testify.  The DOE objected

5     to the witness being there.

6          THE COURT:  I'll hear from my friends at the back

7     table whether they'd object, but what I'm saying to you is, is

8     it just the transportation, or are you also asking for

9     injunctive relief with respect to nursing services, and if so,

10    what is my record for that?

11         MR. BELLANTONI:  The nursing services for the students

12    in Grullon have been paid in full up to the date since this

13    action began.  There is nursing outstanding for -- let's see.

14    Well, the one student it's outstanding for we don't have to

15    discuss.  So now that the nursing has been paid, your Honor, to

16    date there wouldn't be the urgency.  I wouldn't be pursuing any

17    kind of order or injunction on the nursing either.  The

18    transportation remains the issue, Judge.

19         THE COURT:  OK.  It is your understanding -- let me

20    see if I can state this correctly -- that the particular

21    pendency orders at issue in these students' cases require DOE

22    to pay transportation costs without regard to whether the

23    student was on the bus or not, correct?

24         MR. BELLANTONI:  For -- yes.  Well, yes.  Specifically

25    for two of the three students that are remanded in Rodriguez,

O15WgruC

1    the answer is unequivocally yes.  And a third one, I couldn't

2    make the same argument I can for the other two, Judge.

3        THE COURT:  Let me try that a little bit differently.

4    For E.R., for M.C., for A.C., the pendency order simply says

5    "shall fund transportation costs."  For S.C., the pendency

6    order says "transportation to and from the school and home, no

7    more than 50 miles."

8        I understand from my colleagues' decisions in similar

9    cases, and I'm thinking in particular of Judge Oetken's

10    decision, which I think is in Abrams, and Judge Furman's

11    decision, that the way to harmonize their decisions was to find

12    that if there was no specific restriction in the FOFD regarding

13    actual use of the transportation services, that either they got

14    paid, they were entitled to be paid, or there was a remand to

15    figure out what that meant.  This was for the "to and from

16    school and home"; I believe Judge Furman remanded.

17        I can look again.  As to the Grullon students, the

18    plaintiffs here, I imagine they have similar pendency orders

19    with similar transportation requirements, but I just want to

20    make sure I understand your argument before I turn to Mr. Vyas,

21    and I understand your argument to be that there is no basis to

22    require your clients to produce records of having actually used

23    the transportation services.  Correct?

24        MR. BELLANTONI:  Yes.  May I just expand a little

25    further?

O15WgruC

1          THE COURT:  Of course.

2          MR. BELLANTONI:  I believe that Judge Oetken may have

3   touched on this briefly, but it was Judge Cronan in the Donohue

4   case that remanded and Judge Furman as well.  Judge Oetken

5   didn't remand.

6          THE COURT:  I remember.  Go ahead.

7          MR. BELLANTONI:  The issues in those cases, your

8   Honor, and we maintain that "to and from home and school" is a

9   term of art more than is a requirement, No. 1.

10          And if I just may?  I don't know if we mentioned in

11   our papers but just for your Honor's own edification, SRO

12   opinion 23-238, that talks about that issue as well.  There was

13   nothing in any of the administrative hearings in the cases that

14   you already discussed that would even hint that the DOE's

15   interpretation is what the IHOs were getting at.  What was

16   discussed in this SRO opinion, if DOE wants to make that

17   objection, wants to put proof that the amount is excessive,

18   wants to show that per diem charging, per diem billing is

19   acceptable and done in the community, that would be evidence

20   they would have to present below.  None of these hearings dealt

21   with this issue as to whether or not transportation was

22   excessive because the parents had to pay for it, whether or not

23   the child went to school, unless it was the defendants' fault

24   and they kind of stymied the process.

25          So unlike other orders that have language that says

O15WgruC

```
 1   DOE shall be limited to payment for rides or services actually
 2   provided, the "actually" instead of just for services rendered,
 3   because we maintain that transportation is a service, but rides
 4   actually used is something different.  The other issue that I
 5   have trouble with is that the school and transportation
 6   providers don't keep attendance records that show the
 7   difference between in-person learning and learning at home,
 8   which is done on a rare basis, but given the children's health
 9   issues, if the records that we turn over say a student is
10   present, that means in the school or at home or someplace else,
11   but present to receive the program; absence is unexcused
12   absence.  The attendance record is modeled after the DOE's
13   attendance record that doesn't say whether a student is
14   learning remotely or otherwise; services are just rendered.  So
15   when the DOE asks for documentation, they don't ask for us to
16   prove it somehow.  They want specific attendance records from
17   iBRAIN.
18           Having told them now that those don't exist, they
19   never come forward and propose a different way that the parent
20   can show that the child was in school.  In a case in front of
21   Judge Schofield -- we're still waiting for a decision -- the
22   parents submitted a declaration.  So now there's 60 days the
23   child was enrolled in school.  She actually attended in person
24   for 11.  The DOE objected to the declaration, but Judge
25   Schofield specifically said where proof of attendance is
```

O15WgruC

```
1    required, it could be proven or attempted to be proven however

2    the plaintiffs want to prove that; you don't have to limit --

3    you don't have to be limited to attendance records.

4              THE COURT:  All right.  But I presume, just stepping

5    back a moment, that you're not disputing DOE's authority or

6    entitlement to at least know or to at least look at the

7    contract that the parent has with Sisters transportation.

8              MR. BELLANTONI:  I am, and there's a reason.  This all

9    comes into evidence at the hearing.  This is the frustrating

10   part.  This is vetting.

11             THE COURT:  Sir, don't talk to me about frustration.

12             Go ahead.

13             MR. BELLANTONI:  I apologize, Judge, but this is

14   already provided.  Do I object to having to give it to them

15   again?  Absolutely not.  But it seems to be that if a matter's

16   on their radar, they get documentation and they'll pay whatever

17   it is.  But if somebody doesn't get to that matter, and we had

18   a matter in front of Judge Schofield again, where everything

19   was supposed to be paid in 30 days and six months later, it

20   wasn't; we have to go back and revisit that, and what happens,

21   again, is well, we need the documentation because either you

22   didn't provide it or whoever you provided it to isn't here or

23   doesn't have it, so we very often have to provide this

24   documentation over and over again.

25             Now, it's different when it's a case on a substantive
```

O15WgruC

```
1    IEP, where somebody orders reimbursement, because even though
2    that should be paid, sometimes the IHOs or SROs are saying
3    within 35 days, there's not a chance of losing a placement that
4    involves prior school years.  Again, when it comes to pendency,
5    the way I understand pendency is in order to maintain the
6    child's placement -- and this is absent *Mendez* right now; this
7    is generally until *Mendez* and here and other circumstances at
8    well, it's not that the DOE has to pay or pay retroactively or
9    necessarily prospectively, but it should be something near live
10   time to continue the placement at the school where the child is
11   entitled to stay put.
12            THE COURT:  Of course, but just to build on that, sir,
13   the losing argument in *Mendez* was the idea that they had to
14   prepay everything, which was a ridiculous argument to make.  It
15   seems to me that the *Mendez* exception, which says that you can
16   get an automatic injunction if the child is in danger of losing
17   a placement means that what you would get, what iBRAIN would
18   get, what Sisters would get, what B&H nursing would get,
19   whatever amount it is, that would cause them to keep providing
20   the services, my fear is that litigations like this are being
21   used to try and get full prepayment, which I don't think
22   they're entitled to.  But I can understand the argument.
23            If, for example, which I don't think I have before me,
24   Sisters were to say that a particular student was in arrears
25   for $16,000, but for $2,000 we'll keep it going, I can order
```

O15WgruC

1    the 2,000.  I don't necessarily have to order the 16.

2            Are we in agreement on that, or are you suggesting

3    that the *Mendez* exception requires full payment?

4            MR. BELLANTONI:  The former, not the latter.

5            THE COURT:  OK.  All right.  I understand that.  OK.

6            MR. BELLANTONI:  May I just address one issue on

7    *Mendez*?

8            THE COURT:  You may.

9            *MR. BELLANTONI:*  The mistake I made in *Mendez* was

10   they -- I didn't catch, is the pleadings asked for payment to

11   the end of the school year rather than to the end of the due

12   process proceedings, and that's why the issue wasn't ripe or

13   the issues prospectively weren't ripe in *Mendez*, because as

14   Judge Nathan held, or wrote, we're not entitled to pendency

15   payments to a point or a date in the future.  The students are

16   entitled to them until the administrative or judicial

17   proceedings are over.  Now, that might have gone beyond the end

18   of the school year.

19           THE COURT:  Yes.

20           MR. BELLANTONI:  That might have been three years, but

21   the mistake there was -- and I wholeheartedly agree; it was a

22   mistake.  I missed it, but the idea that you're entitled to

23   payment until the end of the year in that instance, that

24   argument that was made, but again, not making that here.  I'm

25   not making a date certain.  I'm not even asking for the

O15WgruC

1    prospective payment for transportation from now until June.

2           THE COURT:  Thankfully, at least not yet.

3           MR. BELLANTONI:  And your Honor, the problem with

4    these cases is, with pendency, the school year's only -- well,

5    for these kids it's 12 months, not 10.  So now we're already

6    seven months into the school year and pendency, transportation

7    hasn't been paid for some of these students, but it finally

8    gets -- and this is before Judge Schofield who has had the

9    Araujo matter for three and a half years now, because when she

10   granted the pendency order up front and said yes, you have for

11   pendency, Araujo grew out of Abrams.  They were the same set of

12   students.  Judge Oetken was, his case was looking backwards,

13   which is why he said this really isn't pendency, there's no

14   danger of losing a placement even though the issue can't be

15   remedied with money.  In this case, there's no danger of

16   students losing their placements, because (unintelligible)

17   prior school year.

18          The children in Abrams were also in Araujo, and at

19   that point a cause of action was brought, and I wasn't with the

20   firm at that time.  A cause of action was brought for the

21   upcoming school year, and Judge Schofield wrote and said for

22   some of these kids no pendency or no pendency order, but for

23   the students where the DOE agrees pendency lies at iBRAIN.

24   There's no reason you shouldn't be paying transportation at

25   least as we go, and she granted the injunction.

O15WgruC

1          Now, if there is a reason, this transportation

2    issue -- this is, again, part of the problem -- the DOE after

3    an administrative hearing is ordered to do something, if

4    subsequently they believe they're entitled to documentation and

5    because they're not getting it, it's frustrating the original

6    judge or administrative judge's order, something should be done

7    to resolve that rather than "we're not paying."  Go back to an

8    IHO.  Bring a DPC.  They should come to court and say we

9    acknowledge our responsibility to pay, Judge Failla.  The

10   defendants are frustrating that, and we don't want to get in

11   trouble with a judge or SRO Charrington or IHO Farago.  We need

12   to pay the transportation.  We've asked for simple

13   documentation.  We're not getting it, so we either want to be

14   relieved of our obligation to pay, or we need an order

15   directing the plaintiffs to do whatever it is that they need to

16   do or we think they should do to get that payment.

17          But if we weren't representing these children the way

18   we are, whether it's zealously or something more, they could go

19   years without paying transportation because the parents have no

20   way of enforcing a pendency agreement.  They can't go back to

21   the IHO from last year.  IHO's can't enforce their own

22   agreements.  So we are left in a situation where there are

23   conversations between us and the folks back there.  Sometimes

24   too many, they don't like them, but we try to resolve this

25   before we come here, Judge.

O15WgruC

1          THE COURT:  Yes.

2          MR. BELLANTONI:  Since September, since October, since

3     November.

4          THE COURT:  You're now repeating yourself from our

5     prior conferences.  Let me hear from you regarding anything

6     else in connection with the PI before me, the request for

7     emergent relief today.  And I want to hear from my friends at

8     the back table.

9          MR. BELLANTONI:  Judge, may I have just a moment?

10          THE COURT:  Of course.  You can talk to Mr. Click too.

11          MR. BELLANTONI:  Judge, the only thing I would just --

12     I think I brought this up earlier, for M.C., the tuition that's

13     outstanding is $94,000 from July to December.

14          THE COURT:  I'm sorry?  M.C.?

15          MR. BELLANTONI:  M.C.

16          THE COURT:  M.C. has tuition outstanding.

17          MR. BELLANTONI:  Yes, in Rodriguez, notwithstanding

18     the upcoming year, which I'm not asking for right now, but

19     94,000 outstanding for July through December.

20          Yeah, that would be it.  I'm sorry, judge.  I'm

21     just --

22          Thank you.

23          THE COURT:  One moment, please.  This is M.C. from the

24     first case, the DeJesus Rodriguez case?

25          MR. CLICK:  Yes, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O15WgruC

| | |
|---|---|
| 1 | THE COURT:  OK.  I thought I understood from the |
| 2 | defense that there were no outstanding tuition payments for |
| 3 | M.C. |
| 4 | Yes, Mr. Miller.  Let's hear from you. |
| 5 | MR. MILLER:  Your Honor, if I may? |
| 6 | The city believes that -- I can sit down then. |
| 7 | THE COURT:  Oh, it's interesting, because I was just |
| 8 | about to tell Mr. Click that I really think it's appropriate |
| 9 | for people to stand when they're addressing me, but let me talk |
| 10 | to madam court reporter. |
| 11 | (Discussion off the record) |
| 12 | THE COURT:  Slow down.  I'll let you sit, but |
| 13 | Mr. Click, going forward, judges do not like when you do, as |
| 14 | Mr. Bellantoni did, and sit.  It's a sign of disrespect.  It's |
| 15 | really not cool. |
| 16 | MR. CLICK:  Yes, your Honor. |
| 17 | (Indiscernible overlap) |
| 18 | THE COURT:  It doesn't matter.  Let's move on. |
| 19 | Mr. Miller. |
| 20 | MR. MILLER:  Your Honor, it is the city's position |
| 21 | that indeed we have made payment through December 31 of this |
| 22 | year.  Indeed, as noted in the Sapna declaration, the payments |
| 23 | were made on, via EFT on 8/14 and 9/5.  And she includes the |
| 24 | check numbers as well. |
| 25 | THE COURT:  OK.  I did see that, sir.  I'm not sure |

O15WgruC

1    where the disconnect is, but yes, I have seen it.

2              OK.  I think I'm now going to Mr. Vyas.

3              Mr. Vyas, welcome, sir.  We'll see, if the court

4    reporter can't hear you, we'll let you sit down too.

5              MR. VYAS:  Thank you, your Honor.

6              THE COURT:  I want to make sure I understand the legal

7    framework in which we're operating.  In your opposition

8    submissions, you rely on the traditional test for injunctive

9    relief, the four-part test, and in fact, you say that because

10   of the nature of the relief sought it's effectively a mandatory

11   injunction warranting a higher standard of relief.  When you

12   say that to me, sir, I'm not sure how you're reconciling

13   *Mendez*.  What I imagine you're saying is that *Mendez* says what

14   it says and *Mendez* does, in fact, suggest that you have a much

15   shortened process if there's a showing that the child is losing

16   his or her placement.  But I think what you're saying is that

17   factual showing hasn't been made here, and as a result, we are

18   in the traditional four-factor PI test that you believe has not

19   been satisfied.

20              Am I understanding that correctly?

21              MR. VYAS:  Yes, your Honor.

22              THE COURT:  OK.  But then let's step back one step,

23   please, sir.  Placement has to mean something.  Does DOE

24   believe that placement is limited to tuition only or that

25   placement also includes transportation and nursing services?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O15WgruC

1          MR. VYAS:  Your Honor, it may include ancillary

2    services if they actually impact the student's placement at the

3    school.

4          THE COURT:  OK.  Then let's talk about the specific

5    ancillary services of transportation and nursing.  I think the

6    plaintiffs' argument is that if they can't get to iBRAIN that

7    placement's useless to them.  So I would think transportation

8    might be an ancillary service that might come within the ambit

9    of a placement.  Would you agree?

10          MR. VYAS:  Sometimes, your Honor.

11          THE COURT:  Sometimes.

12          For the plaintiffs in this case, would you agree that

13    it's within the scope of the placement?

14          MR. VYAS:  Yes, your Honor.

15          THE COURT:  OK.  Then how about nursing services?  It

16    would seem for these students that those who have nursing

17    services need nursing services.  Would you agree for the

18    students in these two cases that it qualifies as part of their

19    placement?

20          MR. VYAS:  Yes, your Honor.

21          THE COURT:  OK.  It sounds like nursing services is

22    not the key to today's hearing.  It sounds like the place where

23    the parties diverge is on the issue of transportation services.

24    Mr. Bellantoni is not incorrect that -- that's a very careful

25    statement I've just made.  But it seems to me that a lot of

O15WgruC

```
1     DOE's problem is with the format of the decisions that are
2     being issued by the IHO and that are being upheld or modified
3     by the SRO, and in those cases, could DOE not request that the
4     IHO limit compensable or reimbursable transportation to days it
5     was actually used?  Because that would seem to save us judge
6     folk from having to understand what the IHO meant.  So I
7     understand we've got the record we have today, but going
8     forward, is there a way to speak to IHOs and say, look, we
9     really do need you to be more detailed in what you're allowing
10    just to save us the trouble in subsequent federal lawsuits?
11              MR. VYAS:  Yes, your Honor.  If I may address that?
12              THE COURT:  You may, sir.  Thank you.
13              MR. VYAS:  After Judge Furman remanded that point, the
14    "to and from" language, on November 15 of last year, that's
15    November 15, 2023, an IHO Karen Charrington did issue a finding
16    or an explanation on that point for one of the students in
17    Mr. Miller's case, S.C., in which the IHO said that the parents
18    did not provide any testimony or evidence as to the need for
19    the district to incorporate transportation costs when the
20    student is not utilizing the transportation and found that the
21    DOE is only supposed to pay for the days and for the
22    transportation services actually used.
23              THE COURT:  But was that because of the particular
24    either IEP or FOFD that was applicable in that case?  Because I
25    take the point that Judge Oetken made, which is if there's no
```

O15WgruC

1    specificity about whether it's used or not used and it's just

2    transportation; it would seem that you've just got to pay for

3    it without regard to whether it was used or not.  The case that

4    you've just now, the SRO decision that you've just mentioned to

5    me, IHO decision that you've just mentioned to me, is that

6    another situation where the student wasn't using the

7    transportation because of Covid?

8              No, I'm told.  Very vigorous shaking of head.

9              MR. LINDEMAN:  No, your Honor.  S.C. was one of the

10   students in the Davis case.  This is IHO Charrington

11   interpreting her own prior order --

12             THE COURT:  Thank you.

13             MR. LINDEMAN:  -- explicitly.

14             So what happened in that case is, and what happens in

15   all these cases is, as part of the *Burlington/Carter* test, the

16   parents have the burden to show that these contracts that

17   they've entered into are, in fact, appropriate for the student.

18   IHO Charrington found in this case and in another case, for the

19   student R.Z., I think -- I don't think R.Z. is one of the

20   students in this matter, though.

21             THE COURT:  No, it's not.

22             MR. LINDEMAN:  But certainly is another ongoing

23   litigation relating to similar issues, but IHO Charrington

24   found that the parent had not shown the burden, had not met

25   that burden to show that the contract that they'd entered into

O15WgruC

| | |
|---|---|
| 1 | with Sisters, which I will know note is also run by |
| 2 | Mr. Donohue's family, in-house, surrounded by Mr. Donohue, and |
| 3 | you can go on the iBRAIN website and they'll tell you in |
| 4 | first-person language that his wife runs the company. |
| 5 | THE COURT:  You're breaking my heart. |
| 6 | Can I -- asking for a friend -- DOI no involvement in |
| 7 | this? |
| 8 | MR. MILLER:  Your Honor, we're not -- |
| 9 | (Indiscernible overlap) |
| 10 | THE COURT:  Never mind.  I'll say nothing.  I did not |
| 11 | appreciate that my life is now in service of Mr. Donohue's |
| 12 | family businesses, but OK.  Thank you. |
| 13 | MR. LINDEMAN:  Judge Vyskocil had previously cautioned |
| 14 | our office as to making too big an issue of this.  And it's |
| 15 | fair.  Mr. Donohue's daughter is entitled to the services in |
| 16 | the same way that any other child is. |
| 17 | THE COURT:  Of course. |
| 18 | MR. LINDEMAN:  But it is unlikely that the |
| 19 | transportation company named after her will, in fact, shut down |
| 20 | or prevent her from getting on the bus anytime soon, I believe. |
| 21 | THE COURT:  Yes.  I remain galled by the fact that |
| 22 | S.J.D. is a plaintiff in one of these cases.  Plaintiffs' |
| 23 | counsel should just keep that in mind and think long and hard |
| 24 | about doing that again. |
| 25 | (Indiscernible overlap) |

O15WgruC

1          MR. LINDEMAN:  -- Mr. Donohue or any of these parents

2     have the same burden that any other parent has.  They need to

3     show that their contracts with iBRAIN, with B&H, with Sisters

4     is a reasonable contract.

5          IHO Charrington found that when the Department of

6     Education offered to transport these students or have reached

7     out, a prior iBRAIN employee, Tiffany Semm, said:  No, we don't

8     need that, we have our own transportation.

9          In that context, with that background, it isn't

10    reasonable to ask the Department of Education to be paying

11    these, frankly, incredibly high amounts of money to -- for days

12    when the student isn't using the bus at all, whether it was in

13    Covid or in 2022, I believe, this actually was.

14         THE COURT:  I see.  OK.

15         Let's bring Mr. Vyas back here.

16         Yes, sir.

17         MR. VYAS:  Your Honor, I would like to add one more

18    point, which is I only reviewed this IHO order this morning,

19    but it says that the parents were supposed to upload that order

20    on Judge Furman's docket within ten days of the date of its

21    issuance, and I checked the docket and it's not on there.

22    Otherwise, your Honor would have been able to take judicial

23    notice of this.

24         THE COURT:  OK.

25         Don't sit down just yet, sir.  Thank you.

O15WgruC

1          Let's go back to the actual issues at issue in this

2     case.  You're taking the position, sir, as I understand it,

3     that there is not a basis for the award of injunctive relief.

4     Now, when we talk about tuition, you're right, because the

5     tuition's been paid.  I know what Mr. Bellantoni has said.

6     There is merit to what he's saying, that it shouldn't take DOE

7     years and years to make these payments.  I also appreciate what

8     you're about to tell me, which is you have lots of people to

9     make payments for and only so many people working there.  But

10    let's just stipulate that I understand both sides of the issue

11    on this, and I understand why plaintiffs' counsel believed he

12    had to bring this litigation.  But here we are.  There's a PI

13    hearing.

14         Why are you not obligated -- let me say that

15    differently.  Why should I not order you today to pay the

16    transportation costs?

17         MR. VYAS:  Your Honor, because for the two students in

18    Grullon for whom transportation costs have not been paid, the

19    DOE has requested supporting documentation, showing when the

20    students actually availed of the transport services to and from

21    the school and their homes.  That language is in the orders,

22    and based on at least one IHO's finding of what that language

23    means, IHO Charrington, the DOE's position is that it is

24    entitled to obtain that documentation because as Mr. Lindeman

25    pointed out, these are very high costs and the DOE's entitled

O15WgruC

1    to pay only for the services provided, as are the parents.

2            THE COURT:  But let me please understand that.

3    Mr. Bellantoni is suggesting that at the IHO's level -- and

4    these things came about as a result of some proceeding before

5    an IHO, correct, sir; there were FOFDs that came from an IHO?

6            MR. VYAS:  Yes, your Honor.

7            THE COURT:  So the IHO presumably either was presented

8    or could have been presented with DOE's arguments about the

9    appropriateness of the transportation services; yes?

10           MR. VYAS:  Yes, your Honor.

11           THE COURT:  OK.  So presumably the IHO's being told

12   that Sisters is the preferred transportation company of iBRAIN,

13   also correct?

14           MR. VYAS:  Yes, your Honor.

15           THE COURT:  OK.  You have had whatever opportunity

16   you've needed to have to fight about whether Sisters is gouging

17   DOE for transporting these students, also correct?

18           MR. VYAS:  Yes, your Honor.

19           THE COURT:  And yet the IHOs in these cases have

20   allowed -- well, have allowed for reimbursement of

21   transportation costs with the understanding that the

22   transportation service provider was Sisters; yes, sir?

23           MR. VYAS:  Yes, your Honor.

24           THE COURT:  OK.

25           (Indiscernible overlap)

O15WgruC

1        THE COURT:  No, no.  Excuse me for talking over you,

2   but I just want to make sure I'm understanding the point as to

3   how you get to come to me now and say we need documentation

4   that this stuff was actually used, because Mr. Bellantoni's

5   point is you had that chance at the IHO level.  They said pay

6   the transportation costs.  Here are the transportation costs.

7   You don't now get a second opportunity to attack as a

8   collateral challenge to this litigation the costs of the

9   transportation.  What permits you to do that, sir?

10       MR. VYAS:  Your Honor, for -- so, it depends on the

11  language of the individual FOFD.  For the FOFDs which say pay

12  Sisters this lump sum amount, the DOE has, to my understanding,

13  provided that payment.  The DOE, for example, in Grullon, for

14  the four students, transportation has been paid for -- I

15  apologize, your Honor.

16       THE COURT:  I see.  But the FOFDs in my case say

17  things like pay transportation for 12 months or directly fund

18  transportation costs.  For those, do you believe that language

19  gives you the right or the ability to seek further

20  substantiation of those costs?

21       MR. VYAS:  Yes, your Honor, to the extent that the

22  FOFDs say pay transportation costs up to amount X.  There are

23  some authorities that say that.

24       THE COURT:  I'm just looking at the ones from the

25  first case, E.R., M.C., A.C., just say fund transportation

O15WgruC

 1    costs by provider upon presentation of invoices.

 2              MR. MILLER:  Your Honor, if I may?

 3              Especially for that one, that says that upon

 4    submission of invoices services rendered, it says services

 5    rendered, which means that the invoices must come after the

 6    services were actually rendered.

 7              THE COURT:  Yes.

 8              MR. MILLER:  And what they produced is an invoice from

 9    July of last year, for services that could be rendered as late

10    as June of this current year.  So therefore, we're asking for

11    an invoice for services rendered.

12              For the two other cases, in DeJesus Rodriguez, both of

13    them say "to and from," and that's why we are relying on that

14    language to say, oh, you actually need to transport the person

15    to and from said school, so we need some kind of evidence.  And

16    I want to be clear, your Honor.

17              THE COURT:  And I want you to slow down for court

18    reporter and judge.  Thank you, sir.

19              MR. MILLER:  I apologize.  My apologies.  Yes.

20              I want to be clear, your Honor.  We're not necessarily

21    asking for specific attendance records.  We are asking for some

22    kind of showing, as noted in -- what's the note of that?

23              Forgive me.

24              THE COURT:  The case that Judge Cronan had?

25              MR. MILLER:  Yes, your Honor.

O15WgruC

1          (Indiscernible overlap)

2          MR. MILLER:  That footnote which notes that we are not

3   asking for a specific attendance record but merely an affidavit

4   from somebody who interacted with that student during that

5   transportation.

6          THE COURT:  Could that be the parent?

7          MR. MILLER:  That could be the parent who put the

8   student on the bus, certainly.

9          THE COURT:  OK.  Because Mr. Bellantoni tells me that

10  in another case there was a sworn statement and DOE rejected

11  it.  Mr. Lindeman wants to tell me why.

12         Yes, sir.

13         MR. LINDEMAN:  Apologies, your Honor.  Yes.

14         The statement in Araujo had a significant number of

15  problems.  For one, it was just not a proper sworn statement.

16  The parent testified that she had created it with the help of

17  various people at iBRAIN, trying to remember when the student

18  arrived.  She also didn't state, notably, that the student had

19  taken the bus every day or that the student always went five

20  days a week.  It stated specific dates the student had gone to

21  school and then asked the reader to extrapolate from those

22  dates that the student had, in fact, attended the school every

23  day.

24         There were further issues in that case as well.

25  Something about fair market or Medicaid rates the parties have

O15WgruC

1    failed to agree on.  The declaration didn't necessarily address

2    that there are things going on.  There's a reason it's been

3    sitting in front of Judge Schofield for four months now.  But

4    in terms of a declaration, defendants are on board and would

5    love to see one.  The declaration we received does not say what

6    it needs to say to show the student went to school every day.

7              THE COURT:  OK.  Thank you.  And just so that I'm

8    clear, Mr. Miller, you're saying -- I don't know that I have

9    seen an FOFD in the cases before me that simply says pay

10   Sisters money.  You're saying that when DOE has received those,

11   they pay it in full; they're not asking for the substantiation

12   that you're requesting in this case.

13             MR. MILLER:  That's correct, your Honor.  We would pay

14   it in our normal course of business.

15             THE COURT:  OK.  Since you're apparently the person

16   for transportation issues, until you're not, a reason why I

17   directed plaintiffs' counsel to resubmit the substantiation was

18   specifically because I didn't want your side saying we didn't

19   get it, you have it because I have it.

20             Are you suggesting to me that the substantiation that

21   was transmitted to you yesterday does not suffice?

22             MR. MILLER:  Yes, your Honor.

23             THE COURT:  Why not?

24             MR. MILLER:  Your Honor, we believe that the language

25   that says "to and from" requires some kind of attendance

O15WgruC

1    record, some kind of affidavit, some kind of evidence that

2    indeed the student was transported.  And then for -- where it

3    says that an invoice, upon presentation of invoices for

4    services rendered, we believe that we need an invoice after the

5    services were rendered.

6             THE COURT:  All right.  Let me throw you a softball,

7    sir.  Do I need to resolve that dispute this morning?

8             MR. MILLER:  I don't believe you need to resolve the

9    language this morning.

10            THE COURT:  Good answer.  Why not?

11            MR. MILLER:  Your Honor, because it's plaintiffs'

12   burden to show that their placement is at risk.  They haven't

13   met that burden, and indeed it's a substantial showing and

14   there has not been a substantial showing that indeed their

15   placement is at risk based on transportation.

16            THE COURT:  All right.  Let me talk to Mr. Vyas again.

17            Thank you.

18            MR. VYAS:  Yes, your Honor.

19            THE COURT:  Mr. Vyas, in the submissions that were

20   made in both cases, I believe one of the things that you said

21   was that Mr. Mielnik, the sworn statement that he submitted in

22   connection with other cases but that has been given to me in

23   this case was incorrect because it is based on the statements

24   of another CPA who was himself mistaken.  And I believe I

25   understood you to be saying that there are errors, accounting

O15WgruC

1    and otherwise, in Mielnik's statement and that, therefore,

2    there's a flawed basis for arguing that these students are at

3    risk of losing their placement.  I appreciate that some of

4    these arguments may be mooted by the fact that tuition payments

5    were made, but I would like to understand, if I may, the nature

6    of these errors.  One that was, I thought, identified by you

7    was that there was some -- well, that there were two different

8    dates provided by iBRAIN with two different amounts of

9    arrearages.  Now, that either meant you guys paid a lot of

10    money in that three-week period or that there were errors, but

11    tell me, please, the errors that you believe inhere in

12    Mr. Mielnik's statement.

13           MR. VYAS:  Your Honor, as I point out in the

14    memorandum of law, Mr. Mielnik, assuming that his

15    representations are accurate, claims to have received about

16    $3.1 million between November 21 and December 13, which is when

17    he filed a declaration in the Grullon case before you.  If the

18    operating expenses are $1.5 million, then surely they must show

19    how the money has been used, is being used, why the students'

20    pendency is still at risk.  There has been no showing of that

21    immediate harm that is required for a preliminary injunction

22    here.

23           That was my main point, your Honor.  And then there

24    are changes in the language in the declaration provided to the

25    Court on December 13, which show that the immediacy or the

O15WgruC

1    urgency of any supposed financial straits has been tempered

2    because instead of saying "will close," they say the school may

3    close and so on.

4              THE COURT:  All right.  But hang on now.  You said

5    something different to me.  You said there were accounting

6    errors.  Give me an accounting error.

7              MR. VYAS:  Your Honor, for that I must refer to Mr.

8    Lindeman.

9              THE COURT:  OK.  I'll talk to him in a moment.  Thank

10   you.  But I'm sure DOE is not suggesting, unless you are, that

11   iBRAIN has to close down to prove that it was close to closing

12   down.  Right?  We don't have to get ourselves to that awful

13   place where the school closes down.  Are you just saying that

14   the submissions that have been given to me thus far do not show

15   sufficient urgency to bring this case within the exception

16   articulated in *Mendez*?

17             MR. VYAS:  Yes, your Honor.

18             THE COURT:  OK.  Mr. Lindeman is now going to give me

19   some specifics.

20             Thank you, sir.

21             MR. LINDEMAN:  Yes, your Honor.

22             In October, I received, along with several other -- at

23   least one other law department attorney and multiple recipients

24   at the Department of Education a letter from a Chris Whalen,

25   CPA.  Mr. Whalen's letter is relied upon almost exclusively in

O15WgruC

1    the Mielnik declaration as the reason they believe they're in

2    such dire financial straits.

3            THE COURT:  Is he in-house or outside accounting?

4            MR. LINDEMAN:  I believe Mr. Whalen is outside.

5    That's not entirely clear to me.

6            THE COURT:  OK.  I was waiting for you to tell me he's

7    a family member, and then I just realized that I'd come full

8    circle in this matter.

9            MR. LINDEMAN:  I don't believe he's married into the

10   Donohue family yet.

11           (Indiscernible overlap)

12           THE COURT:  That's fine.  No, no.

13           MR. LINDEMAN:  The Whalen letter purports to state

14   that roughly $3.8 million in various funds are owed along with

15   a whole cavalcade of late fees that they intend to also seek

16   from the Department of Education for the pendency of, give or

17   take, 30 students.  I don't believe -- at one point there were

18   35 to 40 students involved in these matters, but I don't

19   believe they were all attached to that letter.

20           In reviewing that letter, it quickly became clear that

21   even accepting the outstanding amounts as accurate, which I was

22   unable to without evidence and discussions with plaintiffs'

23   counsel they also were not completely convinced of, it became

24   clear that the letter stated in actual number amounts a larger

25   number, more in the realm of 4-1/2 million, and the number

O15WgruC

1    ballooned further beyond that with the late fees that I don't

2    believe we are party to.  When the Mielnik declaration came in

3    a few weeks later, I think, first in the Ogunleye case --

4                THE COURT:  In which case, sir?

5                MR. LINDEMAN:  The Ogunleye case, in front of Judge

6    Broderick.

7                THE COURT:  Give me the spelling.

8                MR. LINDEMAN:  O-G-U-N-L-E-Y-E.

9                THE COURT:  That sounds right.

10               MR. LINDEMAN:  This is Mr. Miller's case.

11               When the Mielnik declaration was first filed, I

12   believe it was also filed with the letter under seal, though I

13   may be misremembering, Judge Broderick asked the parties to

14   meet and confer, which Mr. Mielnik did with Mr. Bellantoni and

15   with representatives from the school and from the

16   transportation company and from the nursing company.

17               We stated then and again in a letter that I authored

18   and sent to Mr. Whalen directly that these numbers seemed to be

19   incorrect.  We believe we paid more than the letter stated was

20   outstanding, but even if the letter was accurate in its, you

21   know, claimed outstanding amounts, that wouldn't, the numbers

22   do not add up to the numbers that are being claimed, and we

23   sought further documentation showing that, you know,

24   settlement, accounting of expenses, any further information.

25               We have not received that either from Mr. Whalen, who

O15WgruC

1    never responded to my letter, or from Mr. Mielnik or anyone at

2    iBRAIN, Sisters or the nursing company, B&H.  But since then, I

3    understand from Ms. Kapoor that we have paid nearly $7 million,

4    maybe more than that, in tuition costs alone.  I am not as

5    fluent on where the nursing and transportation costs are, but

6    they are a significantly higher number.  But the Mielnik

7    declaration has not changed.  It was initially filed in late

8    October or early November, and it was filed again in December

9    with the same exact numbers and the same exact concerns.  May

10   versus will language aside, the numbers are all exactly the

11   same, despite that I know for a fact that in that time period

12   we received -- we paid significant funds.

13            THE COURT:  But a lot of the payments that I've seen

14   were done after, let's say, December 20, in the time period

15   before the end of the year.  Correct?  In this case.

16            MR. LINDEMAN:  In this case, yes, but Mr. Bellantoni

17   specifically told Judge Hall, in the Eastern District, two or

18   three weeks ago that on Thanksgiving Day the school received

19   700,000 to a million dollars.

20            THE COURT:  Oh, I remember hearing something being in

21   the portal, which is the manner in which payments are received.

22   OK.

23            My point is are you telling me that the Mielnik

24   declaration has been filed subsequent to payments, significant

25   payments by DOE, and yet its arrearages do not reflect any

O15WgruC

1    reduction?

2            MR. LINDEMAN:  Yes, your Honor.

3            THE COURT:  OK.

4            MR. LINDEMAN:  Before Thanksgiving we received

5    preliminary injunction and TRO motions in Zimmerman v. Banks,

6    in Crosley v. Banks, as well as Myers v. Banks and Ogunleye v.

7    Banks and maybe a fourth or fifth case, all of those before the

8    holiday.  Over that holiday and in weeks surrounding it,

9    significant payments were made.  They were already in the

10   process.  They were simply in process, vouchered and eventually

11   paid through the electronic portal.  After that, we continued

12   to receive further preliminary injunction motions.  Those

13   motions make the same claims as before.  I don't think the

14   numbers were right at the beginning, so if they are, so I

15   suppose it is possible that they've been corrected in such a

16   way that they simply look the same or very similar to me.  But

17   they were, I believe, wrong at the jump and they've continued

18   to be wrong.  As our payments have gone up, the numbers they

19   have claimed is not really straight.

20           THE COURT:  OK.  So when your colleague said to me

21   that there are accounting and other errors in the Mielnik

22   declaration, what you're really saying to me is based on your

23   understanding of what's been paid, the numbers in the Mielnik

24   declaration could not be correct at least insofar as the

25   version of the declaration submitted in my case postdates

O15WgruC

1   payments made by DOE.

2              MR. MILLER:  And also because the Mielnik declaration

3   appears to be quoting from the Whalen letter, which I believe

4   Mr. Mielnik references by name.

5              THE COURT:  Yes.

6              MR. LINDEMAN:  And the Whalen letter in its text is

7   mathematically inaccurate.

8              THE COURT:  OK.  Thank you.

9              MR. LINDEMAN:  I apologize.  I want to correct that

10  there is a slightly lower amount between the November 21 and

11  December 13 record, though I do not believe this 1.2 million

12  number matches the declarations that I've received from

13  Ms. Kapoor.

14             THE COURT:  OK.

15             MR. LINDEMAN:  So there have been some variations, but

16  not --

17             THE COURT:  Although for all we know, that's just

18  because stuff was in the portal and hadn't yet been credited to

19  the account.  But I hear you.

20             Going back to Mr. Vyas, to remind everyone, we're here

21  for an application for preliminary injunctive relief.  I've

22  heard certain of your arguments.  I want to make sure I've

23  heard all of the arguments.  I commit to you that I've read all

24  of the written materials in this case.

25             What else do you want me to know and what else do you

O15WgruC

1    wish to say, if anything, in response to the arguments

2    Mr. Bellantoni made earlier today about why injunctive relief

3    regarding transportation services is proper or not proper?

4           MR. VYAS:  Your Honor, the request for injunctive

5    relief for transport services is not proper because they have

6    not established the students are at risk, at immediate risk of

7    losing their pendency placement at iBRAIN.

8           THE COURT:  Is it immediate risk or just risk?  I have

9    to look.  I have the *Mendez* decision here.  Let me just look at

10   that, please, sir.

11          It says Section 1415(j) does not create a procedural

12   right to immediate payment, at least not absent a showing that

13   a child's placement will be put at risk.

14          MR. VYAS:  I apologize, your Honor.

15          THE COURT:  That's fine.  I just don't want to

16   overstate.  But you've actually hit on an issue, sir, which is

17   what does it mean to put at risk.  How much risk does the

18   placement have to be put at before my obligation kicks in to

19   provide injunctive relief?

20          MR. VYAS:  A student must at least receive some

21   communication from the transport company that the transport

22   company is going to stop providing them the transport services

23   to and from their home to the school.

24          THE COURT:  Some of them appear to have.  You just

25   don't think those notices are valid because they have the wrong

O15WgruC

1    name.

2              MR. VYAS:  Your Honor, in the Grullon case, not one

3    notice has been provided to the Court from the transport

4    company.  There were two notices from the nursing company, B&H.

5              THE COURT:  Excuse me.  I'm in Grullon, no

6    transportation notices.

7              MR. VYAS:  Yes, your Honor.

8              THE COURT:  In DeJesus Rodriguez?

9              MR. MILLER:  Your Honor, can you give me just a

10    moment?

11             THE COURT:  Yes.  I want the right answers, so yes.

12             Mr. Vyas, what you're saying is, you're perhaps not

13    defining fully and totally what is at risk, but what you're

14    saying is this record does not show at risk because there's not

15    even a notice.

16             MR. VYAS:  Correct, your Honor.

17             THE COURT:  OK.

18             MR. MILLER:  Your Honor, exhibit 8 on the complaint in

19    DeJesus Rodriguez indeed is a notice from -- well, purportedly

20    from Sisters saying that there is some outstanding balance and,

21    unfortunately, we must require these balances be paid within 30

22    days or we may no longer be able to provide your child with

23    transportation services.  Your Honor, this notice is dated

24    October 10, 2023.  30 days have long come and gone before

25    actually the filing of the instant case.

O15WgruC

```
 1              THE COURT:  Slow down, please, sir.

 2              MR. MILLER:  -- before the filing of this, and so it

 3     has little import as to whether or not Sisters would actually

 4     discontinue traveling -- sorry, discontinue transporting the

 5     student.  But your Honor, I actually want to --

 6              THE COURT:  Just to be clear, this is exhibit 8, sir?

 7              MR. MILLER:  Yes, your Honor.

 8              THE COURT:  I see.

 9              And it's only with respect to M.C.?

10              MR. MILLER:  I believe that's M.C., your Honor.

11              THE COURT:  OK.

12              MR. MILLER:  But your Honor, I want to actually come

13     back to something you said very early in this proceeding, where

14     you noted the relief should only be as much as required to keep

15     the student transporting on the transportation.  What this

16     contract seems to do is front-load a lot of the payment.

17     Indeed, the payments were required on July and then in

18     September and then another payment that's now due in January.

19     Again, that is front-loading, which is, of course, this Court's

20     concern.

21              THE COURT:  All right.  Thank you.

22              Mr. Bellantoni -- wait.

23              Mr. Vyas, anything else, sir?

24              MR. VYAS:  No, your Honor.

25              THE COURT:  OK.
```

O15WgruC

1        Mr. Bellantoni, I wish to hear from you in reply.

2   Thank you.  Unless, of course, there's nothing to add.

3        MR. BELLANTONI:  Your Honor, I'm going to try and be

4   brief, although that's hard for me.

5        With respect to the Whalen letter that was sent, it's

6   interesting that nobody told you exactly what the discrepancies

7   were.  Mr. Lindeman wrote a letter, and he and I talked about

8   this.  Mr. Whalen's figures added up to a total amount of $3.9

9   million that was due in tuition, which is what he said.  When

10  you sit next to the letter with a calculator, his numbers add

11  up to 4.5 million, so while Whalen might not be the best

12  accountant at accounting, the numbers that he said were owed,

13  which Mr. Mielnik confirmed or he checked that was the amount,

14  was 4.5 million.  So the Whalen letter was wrong in the DOE's

15  favor, not the parents'.  So when he wrote that letter, $4.5

16  million in tuition that was outstanding, not the 3.9 million he

17  referenced in his letter.

18        As far as Mr. Mielnik's declaration, every time he

19  provided me with his declaration, numbers were adjusted.

20  Figures may have been the same in declarations.  He provided or

21  may have provided as background information that up to October

22  or November they hadn't paid 4.5 million; that I know when we

23  spoke before about this 900,000 that came in on Thanksgiving

24  Day, but that went into the portal on Thursday.  I didn't find

25  out about that until I got back to work the next week.  And

O15WgruC

1    again, let me explain that a bit if I can.

2              The payments that are made go to service providers.

3    The parents don't see them.  The only way the service providers

4    know when they're approved or made, apart from going in the

5    bank, is there's a payment information portal where they can

6    look and see the payment was approved and coming.  Sometimes

7    that information isn't put in the PIP for weeks.  Sometimes it

8    goes in and says payment will be ready in 10 to 14 days.  So

9    the movement that started at or around Thanksgiving based on

10   the motions we were filing didn't result in those payments

11   coming in or being fully realized until the end of the year.

12             As far as the 900,000, when I say I that was paid,

13   900,000 showed up in the PIP on November 23.  I don't think

14   that was actually paid out until November 30 or the first week

15   in December.  So the Mielnik declaration, as counsel did

16   indicate earlier, showed less of an urgency towards the end of

17   the school year because Mr. Mielnik was honest in the

18   declaration that payments had been received and that the

19   urgency wasn't the same as it was when these matters started.

20             As far as *Mendez*, your Honor, the *Mendez* court uses

21   two words in two different places: "at risk" is one and

22   "jeopardized" in another place, if the placement has been

23   jeopardized, which is certainly a long way from irreparable

24   harm.  Whether or not we've met the jeopardized standard is a

25   different story, but as far as the standard being the same,

O15WgruC

1    it's a lot different than the irreparable harm standard, just

2    saying that it's been jeopardized.

3            And again, to go back to some of these orders that

4    talk about transportation.  The DOE or counsel keeps using that

5    one phrase "to and from home and school," rides to and from,

6    but they're not using it in the bigger context.  The kids in

7    the public school system get on a bus in one location.

8    Everybody goes to the bus and the bus goes from the bus stop to

9    school.  The transportation these students get, because they're

10   in wheelchairs, is a van.  It's not a bus.  There's only one or

11   two students on the van, and the transportation is described as

12   being or what the parents are entitled to and that is

13   transportation that picks the child up at the curb in front of

14   their house and drops them off at the curb in front of the

15   school, so it's door to door, to and from.  Nothing in that

16   language itself suggests that means that you have to prove when

17   rides are provided, and nobody has said that yet.

18           Charrington, IHO Charrington did change her order when

19   it was remanded from the general language, but then she

20   specified or she clarified what it should be.  Neither Judge

21   Cronan or Judge Furman looked at that language and said yes, it

22   definitively means that rides are limited on a per diem basis.

23   Judge Furman said it could be, it could not be.

24           THE COURT:  But Judge Furman remanded back to the IHO,

25   and here's one IHO who is suggesting that.  Correct?

O15WgruC

1          MR. BELLANTONI:  Well, she changed her language, yes.
2     That was her intention originally.
3          THE COURT:  Yes.
4          MR. BELLANTONI:  But that was one.  The others have
5     not.  That was one.
6          THE COURT:  Right.  Have the others done something
7     different, or have they simply not been given an opportunity to
8     reflect on what they meant?
9          MR. BELLANTONI:  No.  I believe some of them were
10    given that opportunity.  I'm only aware of one change so far.
11         THE COURT:  OK.
12         MR. BELLANTONI:  Not all the remaining cases have been
13    heard, but there is not a case yet from the office of state
14    review that has agreed with those decisions.  The four of five
15    now -- before I contradict myself, one in this case.  Three or
16    four IHOs in other cases that may have adopted the language
17    they suggest originally, not a remanded case, just a separate
18    case, when they were appealed, the SRO said:  No, no, no.
19    We're not going to do this on a per diem basis.  The DOE has to
20    pay what the parents are paying.
21         So yes, one IHO, as far as I'm aware, changed her
22    decision or clarified it.  There have been two or three IHOs in
23    other --
24         THE COURT:  Are you suggesting, sir, that the SRO, if
25    it were to review what this IHO did, would say that her

O15WgruC

1    intentions, however articulated, are wrong and that she should

2    not have done this.

3         MR. BELLANTONI:  To date that's all they've done.

4    They've done that in a case with IHO Murphy.  I don't know who

5    the IHO was in 23-38, and I don't know -- it would surprise me

6    if that other case has gone to an SRO yet, although that's a

7    70-day process so I'd have to check to see if IHO Charrington

8    was, in fact, reversed.  But again, to date, your Honor -- and

9    I can give your Honor a copy of this opinion.  I don't have

10   more than one, I underlined -- no SRO opinions have held --

11   now, clarify, I'm not sure that they said this is wrong, that

12   it can't be done this way, but there hasn't been a hearing yet

13   or a decision was rendered where an IHO said or an SRO affirmed

14   the fact that there was proof provided that supported the DOE's

15   position.

16        And I'd just note when Mr. Lindeman advises your Honor

17   that IHO Charrington found that the parents didn't meet the

18   responsibility or suggested that it is the parents'

19   responsibility to show that the transportation is appropriate

20   is exactly the opposite of what SRO Harrington said on page 11

21   of the SRO opinion I cite.  The district did not argue that the

22   cost of iBRAIN or transportation or nursing was unreasonable

23   during, in partial process hearing.  The district did not

24   present any evidence that the cost of tuition or transportation

25   or nursing was excessive by reference to evidence of lower cost

O15WgruC

programs and/or services that were comparable to and available

in the same geographic area or correlated to the length of the

school day.  The district did not attempt to show whether

similar transportation or nursing to those being provided to

the student by the private agency could have been provided at

significantly lower cost by some district entity or the public

school itself.

Your Honor, if I may?  There's nothing that prevents

the DOE from busing these kids to school, and it's not iBRAIN

that provides transportation.  It is not iBRAIN that insists on

Sisters.

THE COURT:  Well, except for fact that on the iBRAIN

website, Mr. Donohue makes a big point of saying that he felt

that the office of people transportation within DOE was riddled

with corruption and incompetence, and therefore, he asked his

wife to set up a private transportation company.  So in fact,

yes, they could, but he has decided to align himself with his

wife's company.

MR. BELLANTONI:  I don't represent him.

THE COURT:  You keep saying that, but OK.  You and I

will disagree on that.  Ultimately, you serve as house counsel

for iBRAIN.

MR. BELLANTONI:  I don't, Judge.  I don't.  I

represent students that don't go to iBRAIN in other states.  I

don't just represent iBRAIN students.

O15WgruC

1          THE COURT:  All right.  Let's move on.

2          MR. BELLANTONI:  I apologize.

3          THE COURT:  You were trying to explain to me that DOE

4     itself could bus the students.

5          MR. BELLANTONI:  Some students don't need

6     transportation.  Their parents have a van and drive them there.

7     In some cases IHOs have said either pay the cost of

8     transportation or provide it.  In fact, bringing Donohue out of

9     the picture for a moment, these children shouldn't be punished

10    for his sins.  If the district provides a FAPE there wouldn't

11    be any school.  If the district doesn't want to pay for

12    pendency, they don't have to pay for something it doesn't give

13    them.  They agree to provide these services for these students

14    when they take the money.  None of these services that I'm

15    asking you to enforce -- things that I'm asking for, they've

16    already been ordered.  I'm sure there are plenty of IHOs that

17    would love to find there's something nefarious going on in

18    iBRAIN, Sisters or B&H.

19          THE COURT:  I'm inviting DOE to refer this to DOI.

20          MR. BELLANTONI:  And they never do.  I've invited them

21    to do the same thing, and they don't.  Magistrate Fox invited

22    them to do the same thing in Judge Oetken's case, in Abrams.

23    If you're saying that there was corruption going on, then prove

24    it.  Mr. Thayer wouldn't use the word "corruption" with Judge

25    Fox.  Are you saying there's corruption going on there?  Well,

O15WgruC

1    not quite that, but, you know, it is what it is.  If there's

2    corruption going on, I don't represent them, so if there is,

3    doesn't matter to me one way or the other.

4              THE COURT:  Let's just finish this, please, sir.

5              MR. BELLANTONI:  I'm just trying to get back to --

6              THE COURT:  We're here for the PI motion.

7              MR. BELLANTONI:  I'm just trying to get back to the

8    transportation issue.

9              THE COURT:  Yes, sir.

10             MR. BELLANTONI:  I'm not asking for, as Mr. Miller

11   said, transportation to the end of the school year but what's

12   been provided already.  The DOE should either have paid these

13   students or come into a courtroom and said exactly why they're

14   not paying it, then tell us what we would have had to do to get

15   reimbursed.  But they didn't do anything.  They waited until

16   the agency is in a financial bind, and they just keep asking

17   for those records.  There's no reason why they couldn't have

18   asked for these records in August and, when they weren't

19   provided, come to you then and saying:  We don't want

20   Bellantoni running to the courthouse, you know, again with

21   another PI.  He's overweight.  He's old.  He's going to drop

22   dead.  So other than that happening --

23             THE COURT:  We will take this more seriously.

24             MR. BELLANTONI:  Well, I'm just trying to add light to

25   this, but I don't sprint to the courthouse.  I know that's what

O15WgruC

```
1    they say I do all the time, but I don't.  (Unintelligible)

2    resolve these issues, even after a letter is sent to them by an

3    accountant saying the school's in financial trouble, there was

4    no phone call.  It took Mr. Lindeman weeks to answer that

5    letter.  There was no phone call to anybody saying what can we

6    do to avert a close down of the school.  Nothing.

7             THE COURT:  I don't think it's DOE's obligation to

8    avert a close down of the school.

9             MR. BELLANTONI:  Well, when they have an obligation to

10   pay pendency for those kids --

11            THE COURT:  The children can be educated elsewhere,

12   sir.

13            MR. BELLANTONI:  I'm sorry, Judge?

14            THE COURT:  Let's get back to the issue.

15            MR. BELLANTONI:  Educated where?

16            THE COURT:  They could be educated elsewhere.  There

17   has to be some other school.  What about I Hope?

18            MR. BELLANTONI:  That's the only other one in the

19   city.  In the past some of the clients go back and come back to

20   us and go back.  But they're not going to be able to provide

21   services for these students that quickly, especially when the

22   reason they're coming here is because of DOE's funding the

23   education they're supposed to fund.

24            THE COURT:  Sir, stop now.

25            MR. BELLANTONI:  Yes, Judge.
```

O15WgruC

1          THE COURT:  Stop now.  I'm not going to have a PI

2     motion on the wisdom of the management decisions of iBRAIN.

3          I'm going to take a break, because we've been talking

4     for a long time.  Imagine, come back in about five or ten

5     minutes, and I'll do what I can.  I'm going to think about the

6     arguments you've raised just now.  Thank you all very much.

7          (Recess)

8          THE COURT:  Thank you all so much for your patience.

9          Mr. Bellantoni, lest I forget, I'm going to ask you,

10    please, to obtain a transcript of this conference in the

11    ordinary course, or with whatever speed you'd like.

12          I'll also say that this is an oral decision, so it may

13    not be as pretty as one of my written decisions and I'm not

14    really focusing on the law as much here in terms of giving you

15    citations because it appears that the parties are in agreement

16    as to the appropriate standards here.

17          Ultimately where I come out is as follows:

18          I'm not saying that it wasn't appropriate to bring

19    this case or these cases -- there are two of them -- and I'm

20    not saying that there isn't some problem with DOE's timing of

21    payments, but I don't believe on the record before me that

22    there is a basis for preliminary injunctive relief.  For

23    whatever reason, either the filing of this lawsuit, the timing

24    of their fiscal year or the goodness of their hearts, DOE has

25    made a number of payments after this lawsuit was filed, and

O15WgruC

1    therefore, it is not nearly as emergent as it once was.  And so

2    accepting the standard here that there is the traditional

3    preliminary injunction standard but that it is modified or

4    altered if the exception recognized by the court in *Mendez* is

5    met, which is that the students' placement is at risk or

6    jeopardized, and also recognizing, as I think the parties have

7    today, that placement in this setting would include

8    transportation and nursing costs, I still do not have a basis

9    for preliminary injunctive relief.  There have been payments

10   made for tuition.  What began as a tripartite set of arrearages

11   for transportation and nursing and tuition is now limited to

12   certain plaintiffs, certain transportation costs.  And so even

13   agreeing with the parties or even assuming for the purposes of

14   this decision that the placement identified in *Mendez* extended

15   to these nontuition components of the FOFD, I do not believe

16   that there is a showing.

17        Now, I want to back up a moment and say that the

18   record before me on transportation is a single exhibit.  It is,

19   I believe, exhibit 8 in the first litigation, and it is a

20   letter from Mr. Lam, the manager of Sisters Travel and

21   Transportation Services, to Mr. and Ms. Cohen, regarding one of

22   the plaintiffs here.  I believe that's the only thing I have in

23   terms of an actual notice that the child's placement or at

24   least the transportation component of that placement was in any

25   way jeopardy.  And what it says is, "We must require that these

O15WgruC

1    balances be paid within 30 days or we may no longer be able to

2    provide your child with transportation services."

3        To begin, that is one letter for one student in all of

4    these cases, and that does not, for me, make the showing that

5    is necessary under *Mendez*.

6        No. 2, I'm now advised that the transportation entity

7    is affiliated by marriage with iBRAIN, and so just as I hinted

8    earlier that I couldn't think of a world in which plaintiff

9    S.J.D. would not be able to receive educational services at the

10   school her dad founded, I do not believe there's a world in

11   which Sisters Travel and Transportation Services would not

12   provide transportation services to iBRAIN, and similarly

13   there's no world in which they wouldn't provide them to S.J.D.

14   And so what I don't have is a showing that any of these

15   students is in jeopardy.

16       I'll also note that the threat that was contained in

17   this October 10 letter, which was that balances must be paid or

18   the child might not receive transportation service, has not

19   come to pass.  I have no record in late December or early

20   January indicating that this could happen.  So for these

21   reasons, I do not find a basis for preliminary injunctive

22   relief.

23       Let me be clear -- I direct this to my friends at the

24   back table -- that I am not today deciding what substantiation

25   DOE can legitimately request before making payments, and I'm

O15WgruC

```
 1   also not necessarily agreeing with your interpretation of
 2   various IHO decisions.  That has to be decided.  I'm not sure
 3   it's going to be decided by me, but I would not take my
 4   decision today to mean that I'm going to agree with you that
 5   you're allowed to request the substantiation that you're
 6   looking for.
 7         Finally, and I'm just saying this because this
 8   decision may be appealed and I want to have this on the record,
 9   in my now ten years as a judge, I have been witness to three
10   waves of litigation brought on behalf of students at iBRAIN,
11   and it's just different qualitatively and quantitatively from
12   any other IDEA litigation that I have.
13         The first wave, which I imagine was somewhere around
14   2019-ish, was what I refer to colloquially as the schism
15   between I Hope and iBRAIN, and there I had many, many lawsuits
16   addressing the issue of pendency and the idea that pendency
17   either was or was not a voucher that could be used to allow the
18   student entrée into other schools.  That was decided, I
19   believe, by the Second Circuit in the *Ventura de Paulino* case.
20   It was a very aggressive position taken by iBRAIN, and it
21   failed.
22         The next wave of litigation with which I've been
23   involved was what I'll call the front-loading litigation and
24   that seems to have reached its apex in *Mendez*.  And now we have
25   this, so I'm not saying DOE should not pay timely.  I think
```

O15WgruC

1  they should.  I don't know what timely is, but they should pay

2  it.

3          I am troubled, though.  Let me say this differently.

4  I'm also not saying that students at iBRAIN, if not iBRAIN

5  itself, should not advocate for prompt payment, and I actually

6  have no horse in the race as to iBRAIN's continuing vitality or

7  viability as a provider of its services to students.  It is not

8  my place to keep them afloat.  It is not my place to shut them

9  down.  All of that said, I am troubled, because with each of

10 these three waves of litigation, iBRAIN has suggested that

11 somehow its students and by extension it is entitled to payment

12 ahead of everybody he would.  There are many schools and many

13 students, and I am troubled by these aggressive litigation

14 positions to basically short circuit the line that every other

15 school's students waits on.  So I will see what happens with

16 the remainder of this case, but today, on this record, I am not

17 imposing preliminary injunctive relief.

18         I think that means that the parties should talk about

19 a case management plan and about whether there's anything else

20 you wish to do.  And I just say this because hope springs

21 eternal at this side of the bench.  If the parties want

22 mediation, fine.  If the parties want to be before the

23 magistrate judge, fine.  If the parties want to meet for a

24 settlement conference before me, also fine.  I don't know how

25 much discovery you all need.  I feel like you all know what's

O15WgruC

```
 1   going on.  Other than payment of these invoices I'm not sure

 2   what the end game of this litigation is, but I ask you all to

 3   talk.  I know you're talking because you have other cases

 4   together, and you'll tell me what you want me to do.  For now,

 5   you have two weeks to get to me a proposed case management

 6   plan, and in that case management plan, or with its

 7   transmittal, you can include any other relief or assistance

 8   that I can provide to you.

 9           I believe I've addressed the issues that are before me

10   now.  We'll issue either a minute entry or an order just

11   reflecting my denial of the motion for preliminary injunctive

12   relief in the two cases.  I believe only the second case had a

13   request for a temporary restraining order.  That was denied in

14   a prior telephone conference.

15           Mr. Bellantoni, anything else I should be addressing

16   today, sir?

17           MR. BELLANTONI:  No, your Honor.

18           THE COURT:  OK.

19           And Mr. Vyas, consult with your colleagues.  Anything

20   else I should be addressing today?

21           MR. VYAS:  No, your Honor.  Thank you.

22           MR. MILLER:  Your Honor, in DeJesus Rodriguez, I did

23   not put in an answer.  I'd ask that the time to answer would be

24   extended also for two weeks.

25           THE COURT:  Of course.  Have you put an answer in the
```

O15WgruC

1    other case, sir?

2            MR. VYAS:  No, your Honor.  I request an extension.

3            THE COURT:  Excuse me.  Thank you for reminding me of

4    my job.  I should have actually done that.

5            Let's do two weeks for the answer, one week after that

6    for the case management plan.  Is that sufficient time for

7    everyone?

8            MR. MILLER:  For the city, your Honor, yes.

9            MR. BELLANTONI:  Yes, Judge.

10            THE COURT:  OK.  Terrific.  Go forth, everyone.  Thank

11    you so much for coming in today and for arguing.  It was very,

12    very interesting.

13            Thank you so much.

14            We're adjourned.

15            (Adjourned)

16

17

18

19

20

21

22

23

24

25